# United States Court of Appeals
## For the First Circuit

Nos. 14-1622, 14-1724

NATIONAL LABOR RELATIONS BOARD,

Petitioner, Cross-Respondent,

v.

NSTAR ELECTRIC COMPANY,

Respondent, Cross-Petitioner.

APPLICATION FOR ENFORCEMENT AND CROSS-PETITION FOR REVIEW
OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

Before

Howard, <u>Chief Judge</u>,
Thompson and Barron, <u>Circuit Judges</u>.

<u>Jeffrey W. Burritt</u>, with whom <u>Usha Dheenan</u>, Supervisory Attorney, <u>Richard F. Griffin, Jr.</u>, General Counsel, <u>Jennifer Abruzzo</u>, Deputy General Counsel, <u>John H. Ferguson</u>, Associate General Counsel, and <u>Linda Dreeben</u>, Deputy Associate General Counsel, were on brief, for petitioner.
<u>Keith H. McCown</u>, with whom <u>Jeffrey S. Siegel</u> and <u>Morgan, Brown & Joy, LLP</u>, were on brief, for respondent.

August 17, 2015

BARRON, **Circuit Judge**.    The National Labor Relations Act, 29 U.S.C. §§ 151-169, requires a company to bargain with a union that represents "employees" of that company.    In this case, the National Labor Relations Board asks us to enforce an order that requires an electric and gas company to bargain with a union that seventeen of the company's dispatch-center workers voted to join.    The company's cross-petition for review contends, however, that the company has no obligation to bargain with the union on behalf of those workers.    The company argues that these workers' responsibilities make them either "supervisors" or "manager[s]" rather than "employees," and thus that the Act does not protect their right to have the union represent them.    We hold that substantial evidence supports the Board's finding that the company failed to make that showing, even though these workers are highly skilled and charged with critical tasks.    We thus grant the Board's petition to enforce the Board's order and deny the company's cross-petition for review.

## I.  Background

This case ultimately turns on what the administrative record shows about what these workers have the authority to do.    To see which of their job functions matter and why, it helps to understand the legal background.    And so, before describing who these workers are and what authority they have, and the procedural path that brings this case to us, we describe the relevant parts

of the National Labor Relations Act and some key Board decisions and court precedents.

## A. Legal Background

The Act provides that "[e]mployees shall have the right to . . . join . . . labor organizations," 29 U.S.C. § 157, and a company must bargain with the union the company's employees choose to represent them, id. § 158(a)(5). The Act makes clear, however, that not all persons a company employs enjoy that right. Specifically, the Act states that "any individual employed as a supervisor" is not an "employee." Id. § 152(3). As a result, "supervisor[s]" do not have the right to join a union under the Act. See NLRB v. Ky. River Cmty. Care, Inc., 532 U.S. 706, 709 (2001). And thus an employer has no duty to bargain with a union that purports to represent workers who in fact qualify as supervisors. See id.

The reason that the Act does not protect supervisors is easy to grasp. The Supreme Court explained in 1974 that the Act "was intended to protect 'laborers' and 'workers' whose right to organize and bargain collectively had not been recognized by industry, resulting in strikes, strife, and unrest." NLRB v. Bell Aerospace Co., 416 U.S. 267, 279 (1974). The Court went on to explain that "there was no similar history with respect to foremen, managers, superintendents, or vice presidents." Id. Moreover, Congress was concerned that "unionization of supervisors had . . .

upset the balance of power in collective bargaining, . . . tended to blur the line between management and labor," and "deprived employers of the loyal representations [sic] to which they were entitled." Id. at 281.

A related logic underlies a second exclusion under the Act. This one covers so-called "managerial" employees. The Supreme Court read this exclusion into the Act -- as an implied limit on the meaning of the word "employee" -- for reasons not unlike those that led Congress expressly to exclude supervisors. See id. at 274-75.

A great deal of Board and judicial precedent addresses the scope of these two exclusions. A surprising number of those precedents concern the status of electrical workers who, loosely speaking, do work similar to that done by the electrical workers at issue here.

For a long time, the Board regularly held that such workers -- often called electrical dispatchers -- were not supervisors or managerial employees and thus could unionize. See, e.g., Ariz. Pub. Serv. Co., 182 N.L.R.B. 505 (1970). But in the 1980s, in Big Rivers Elec. Corp., 266 N.L.R.B. 380, 383 n.2 (1983), the Board overruled those decisions and found such workers to be supervisors. In 1999, however, the Board reversed course again. In Mississippi Power & Light Co., 328 N.L.R.B. 965 (1999), the Board overruled Big Rivers and found that electrical workers in

that case -- and others like them -- were "employees" and thus could unionize.

Soon after the Board decided Mississippi Power & Light in 1999, however, a new complication arose. In 2001, the Supreme Court held in Kentucky River that the Board's construction in that case of one part of the Act's supervisor definition was inconsistent with the statutory text. 532 U.S. at 721. And while that case involved nurses, not electrical workers, see id. at 710, the Board's decision in Mississippi Power & Light had relied on a very similar construction of the same piece of the supervisor definition that the Court rejected in Kentucky River. See Miss. Power & Light, 328 N.L.R.B. at 970.

So, in 2011, the Board once again revisited the status of electrical dispatchers in a case called Entergy Mississippi, Inc., 357 N.L.R.B. No. 178 (2011). And there, the Board applied the new interpretation of the supervisor definition that the Board had developed after Kentucky River in Oakwood Healthcare, Inc., a case that also (like Kentucky River) involved the status of nurses. See 348 N.L.R.B. 686, 692 (2006). On the basis of that new interpretation, the Board then again found the electrical dispatchers to be employees rather than supervisors. See Entergy Mississippi, 357 N.L.R.B. No. 178, at 5.

## B. Factual Background

It is against this winding legal background that this dispute over the status of these electrical workers now comes to us. In September of 2013, these workers, who were employed at an electric and gas company located in New England, sought to vote on whether to join a union. The union was Local 369 of the Utility Workers Union of America, AFL-CIO. The company was NSTAR Electric Company, a public utility engaged in the transmission and distribution of electricity and gas.

NSTAR manages and maintains high-voltage electrical transmission equipment.[1] That transmission equipment connects electrical generators -- power plants -- with facilities known as "substations." Those facilities then convert the electricity to a lower voltage for distribution to homes and businesses throughout New England.

NSTAR must carefully monitor and maintain its transmission equipment. Otherwise, equipment failures or unanticipated changes in demand for electricity could cause widespread blackouts not only in NSTAR's coverage areas but also in the region's broader electrical grid.

---

[1] We base our description on the undisputed portions of the decision that the Board's Acting Regional Director for Region 1 issued in this matter.

To perform its maintenance operations, NSTAR must be able to take its transmission equipment out of service -- or, as the industry puts it, to de-energize the equipment. NSTAR must be able to do so, moreover, without endangering its employees or imperiling the reliability of the grid.

To safely and reliably de-energize the equipment, NSTAR relies on "switching orders." They set forth step-by-step procedures for the sequential opening and closing of switches in the electrical system. NSTAR uses these switching orders to interrupt the flow of electricity to particular transmission equipment.

To write switching orders, execute switching procedures, and carry out maintenance on de-energized equipment, NSTAR relies on a range of workers. Over seven hundred "field employees" are responsible for carrying out the physical work necessary to implement switching orders and maintain NSTAR's electrical transmission and distribution systems. About thirty first-line "field supervisors" directly oversee the field employees and assign them to shifts, worksites, and geographic regions. Multiple layers of NSTAR management then oversee the field supervisors.[2]

---

[2] The field employees are already members of the Union, and the parties agree that the field supervisors are ineligible to unionize because of their supervisor status.

The seventeen NSTAR workers involved in this dispute work in a large control room in NSTAR's dispatch center. They oversee the reliability and maintenance of NSTAR's transmission system. They work with a software program called "SCADA" that provides data on the status of NSTAR's transmission system.

The first group of these workers are Transmission System Supervisors, or TSSs. They monitor NSTAR's transmission system in real time, energize and de-energize equipment to allow maintenance work, and react to unforeseen events that disrupt the transmission system. They also write switching orders.

The second group of workers are Senior Transmission Outage Coordinators, or STOCs. STOCs perform analyses of the effect of future operations on NSTAR's transmission system. STOCs run simulations to determine when maintenance work can be done consistent with NSTAR's work plan without disrupting the performance of the transmission system. STOCs work with field supervisors to ensure that an adequate number and type of field employees will be available to perform scheduled work when needed. STOCs also fill in for TSSs with "some regularity."[3]

---

[3] There are sixteen workers among those two groups. There is also a single worker involved in this case -- the seventeenth worker at issue -- known as a "Transmission Operations Support Specialist," or TOSS, who sought to join the Union along with the TSSs and STOCs. The parties stipulated before the Board that the TOSS is entitled to join the union if, and only if, either the TSSs or the STOCs are.

## C. Procedural Background

In September of 2013, the Union petitioned the Board to conduct a representation election for the TSSs and STOCs that NSTAR employs. NSTAR objected that the TSSs and STOCs were "supervisors" or "managerial employees" and thus were not "employees" under the Act. A hearing officer held a seven-day hearing on the matter in September and October of 2013. Drawing on that record, the Acting Regional Director for Region 1 of the Board ruled that NSTAR had failed to show that TSSs and STOCs are either "supervisors" or "managerial" employees. The Acting Regional Director thus concluded that they were "employees" under the Act and that an election must be held so that the TSSs and STOCs could vote on whether to join the Union.

On January 29, 2014, the Board, with one member dissenting, denied NSTAR's request for review. The Board ruled that the Acting Regional Director's determination "rais[ed] no substantial issues warranting review." That same day, the Board conducted the election. The TSSs and STOCs unanimously voted to join the Union. On February 10, 2014, the Board certified the Union as representing the TSSs and STOCs.

After NSTAR refused to bargain with the Union as the representative of the TSSs and STOCs, the Union filed an unfair labor practice charge with the Board against NSTAR on February 13, 2014. The Board found that NSTAR had refused to bargain with the

Union as a certified representative of the TSSs and STOCs. The Board thus ordered NSTAR to bargain with the Union on their behalf. The general counsel of the Board filed an application in this Court to enforce that order, and NSTAR filed a cross-petition for review. See 29 U.S.C. § 160(e), (f). NSTAR's cross-petition challenges the Acting Regional Director's determination that the company failed to show that the electrical workers are "supervisors" or "managerial" employees. We consider each of these contentions in turn, starting with the supervisor issue.[4]

## II. Supervisor Exclusion

The Act sets forth a "three-part test" for determining supervisor status. Ky. River, 532 U.S. at 712-13. Workers are supervisors if (1) "they hold the authority to engage in any 1 of the 12 listed supervisory functions [in the Act]," (2) their exercise of such authority "requires the use of independent judgment," as opposed to "routine or clerical" judgments, and, finally, (3) "their authority is held 'in the interest of the employer.'" Id. at 713 (quoting NLRB v. Health Care & Ret. Corp. of Am., 511 U.S. 571, 573-74 (1994)); see also 29 U.S.C. § 152(11).

---

[4] Because the Board declined to exercise its discretionary authority to review the Acting Regional Director's determination in this case, see 29 U.S.C. § 153(b); 29 C.F.R. § 102.67(a); Magnesium Casting Co. v. NLRB, 401 U.S. 137, 142 (1971), we focus our review on the determination the Board's Acting Regional Director for Region 1 made.

The parties' dispute concerns only the first two parts of the test. And with respect to the first part, we need address only the three statutorily listed supervisory functions that NSTAR contends that the TSSs and STOCS have the authority to perform. Those three functions are: the power to "assign," the power "responsibly to direct," and the power to "hire" (or to "effectively recommend" hiring) other employees. 29 U.S.C. § 152(11).

The second part of the test then focuses on whether a supervisory function requires the exercise of "independent judgment." See Ky. River, 532 U.S. at 713. If an employer shows that a worker has the authority to carry out at least one supervisory function that requires the use of "independent judgment," that worker is a supervisor under the Act. See id.

The Acting Regional Director ruled that NSTAR failed to show that the STOCs possessed the authority to perform any of the three supervisory functions at issue. The Acting Regional Director likewise ruled that NSTAR had not shown that the TSSs had the authority to perform two of the three functions -- the power "responsibly to direct" and the power to "hire." Finally, the Acting Regional Director found that NSTAR had not shown that the TSSs would be required to use "independent judgment" to carry out those activities that he assumed (but did not decide) amounted to a power to "assign." As a result, the Acting Regional Director

- 11 -

found that neither STOCs nor TSSs were supervisors, as NSTAR had the burden of showing they were. See Ky. River, 532 U.S. at 711.

In challenging the Acting Regional Director's determinations, NSTAR first takes aim at the Acting Regional Director's legal interpretation of the supervisor definition. NSTAR then challenges his findings of fact. We consider each challenge in that order.

## A. Chevron Deference

When Congress does not speak to the precise question at issue in a statute that an agency administers, we ordinarily defer to the agency's reasonable resolution of the ambiguity. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). That deferential framework clearly applies to the Board's interpretation of the Act's supervisor definition. See Ky. River, 532 U.S. at 713 ("[I]t is certainly true that the statutory term 'independent judgment' is ambiguous with respect to the degree of discretion required for supervisory status." (emphasis omitted)); Health Care & Ret. Corp. of Am., 511 U.S. at 579 (explaining that it "is no doubt true" that "phrases in [the supervisor definition] such as 'independent judgment' and 'responsibly to direct' are ambiguous").

But NSTAR argues that two of the Board decisions on which the Acting Regional Director based his interpretation of the supervisor definition nevertheless do not deserve Chevron

- 12 -

deference. The decisions are Oakwood Healthcare, 348 N.L.R.B. at 692, which applied the supervisor definition to nurses following the Supreme Court's decision in Kentucky River, and Entergy Mississippi, 357 N.L.R.B. No. 178, at 7, which then applied Oakwood Healthcare's construction of the supervisor definition to electrical dispatchers.

NSTAR makes clear its displeasure with the outcomes the Board has reached in decisions that apply the supervisor definition set forth in Oakwood Healthcare and Entergy Mississippi. NSTAR even cites statistics to show that those decisions rarely lead the Board to find that workers are supervisors. But a narrow construction of the supervisor definition is not unworthy of deference just because it favors employees seeking to unionize. The question is whether the construction -- like the one the Supreme Court rejected in Kentucky River -- is "overly narrow" given the statutory text and purposes. Oakwood Healthcare, 348 N.L.R.B. at 688 (emphasis added).

So far as we are aware, every circuit that has considered the question has deferred to the portions of the Board's construction of the supervisor definition in Oakwood Healthcare on which Entergy Mississippi relied, and on which the Acting Regional

Director relied in this case.[5]  And, save for one exception,[6] NSTAR

makes no developed argument for why the interpretation of the

definition set forth in those two Board decisions is overly narrow.

NSTAR does contend that the Supreme Court's decision in

Kentucky River shows the Acting Regional Director should have

relied on the analysis set forth in Big Rivers, 266 N.L.R.B. at

383, in which the Board had found that electrical dispatchers were

supervisors, rather than on the distinct interpretation of the

supervisor definition set forth later in Oakwood Healthcare and

Entergy Mississippi.  But NSTAR is mistaken on that point.

As the Board explained in Entergy Mississippi, Big

Rivers was "decided under a different standard for determining

supervisory status than the one set forth in Oakwood Healthcare

---

[5] See Lakeland Health Care Assocs., LLC v. NLRB, 696 F.3d 1332, 1339 (11th Cir. 2012); Frenchtown Acquisition Co. v. NLRB, 683 F.3d 298, 304 & n.1 (6th Cir. 2012); Rochelle Waste Disposal, LLC v. NLRB, 673 F.3d 587, 594-95 (7th Cir. 2012); Mars Home for Youth v. NLRB, 666 F.3d 850, 854 n.2, 855 n.3 (3d Cir. 2011).

[6] In NSTAR's view, the Board in Entergy Mississippi adopted an unduly narrow view of the power "responsibly to direct."  NSTAR contends that the Board wrongly required an employer to provide evidence that an employee had been "disciplined or adversely affected specifically because" another employee erred.  NSTAR contends that it should be enough to show that an employee's evaluations or compensation are in some way affected by the performance of another employee in order to show that the employee has the power "responsibly to direct."  But the Acting Regional Director did not reject the possibility that evidence of some other form of TSS or STOC accountability for field employee performance could count.  Rather, the Acting Regional Director simply found no such other evidence in the record.  Thus, we have no need to consider this issue.

pursuant to the Supreme Court's guidance in Kentucky River."
Entergy Miss., 357 N.L.R.B. No. 178, at 7. Thus, the Board decided in Entergy Mississippi that it would apply the new Oakwood Healthcare standard, developed in Kentucky River's wake, rather than the one Big Rivers set forth. Id.

NSTAR never explains why Entergy Mississippi was wrong to do so. NSTAR does note that the Fifth Circuit, in Entergy Gulf States v. NLRB, 253 F.3d 203, 211 (5th Cir. 2001), ruled that Big Rivers's approach to determining supervisor status should control after Kentucky River. But the Fifth Circuit came to that conclusion five years before the Board, in Oakwood Healthcare, revised its interpretation of the Act with respect to nurses to reflect Kentucky River, and ten years before the Board then applied Oakwood Healthcare to electrical dispatchers in Entergy Mississippi. As a result, the Fifth Circuit's decision offers no reason to conclude that Kentucky River requires the Board to follow a Board decision that pre-dated that Supreme Court ruling (Big Rivers) rather than to follow the two Board decisions that expressly applied that Supreme Court ruling's reasoning (Oakwood Healthcare and Entergy Mississippi).[7]

---

[7] We note that in an unpublished opinion, the D.C. Circuit reached the same conclusion we reach, distinguishing Entergy Gulf States and instead deferring to the Board's application of Oakwood Healthcare to electrical dispatchers. See Avista Corp. v. NLRB, 496 F. App'x 92, 92 (D.C. Cir. 2013) (unpublished).

- 15 -

In sum, NSTAR makes no developed argument that the two Board decisions on which the Acting Regional Director relied -- Oakwood Healthcare or Entergy Mississippi -- unreasonably interpreted the Act's supervisor definition.[8]  Nor does NSTAR make any such developed argument with respect to any other aspect of the Act's interpretation on which the Acting Regional Director's decision depends.  We thus apply the interpretation of the supervisor definition that the Acting Regional Director applied. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  And so we proceed to consider whether, under that definition, the Acting Regional Director supportably found that the TSSs and STOCs' duties do not suffice to make them supervisors.

## B.  Substantial Evidence Review

The Acting Regional Director made separate findings about the supervisor status of TSSs and of STOCs.  In each case, NSTAR bore the burden before the Board to show by a preponderance of the evidence in the record that the workers are supervisors. See Ky. River, 532 U.S. at 711.  Because the issue is one of fact, our task is to determine whether substantial evidence in the

---

[8] For that reason, NSTAR's heavy reliance on this Circuit's decision in Maine Yankee Atomic Power Co. v. NLRB is also misplaced.  624 F.2d 347 (1st Cir. 1980).  That is because Maine Yankee, like Big Rivers, was decided before the Board's decisions in Oakwood Healthcare and Entergy Mississippi and thus did not address those decisions' constructions of the Act, which differed from those Maine Yankee applied.  See Me. Yankee, 624 F.2d at 361-63.

record, considered as a whole, supports the Acting Regional Director's determination that NSTAR failed to meet that burden. See Ne. Utils. Serv. Corp. v. NLRB, 35 F.3d 621, 625 (1st Cir. 1994).

Under this deferential standard, we may not "displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] de novo." Univ. Camera Corp. v. NLRB, 340 U.S. 474, 465 (1951). And in this context, "[w]e are especially deferential to the Board's determination of supervisory status because we recognize the Board's competence and experience in applying the Act to the complexities of industrial life." Ne. Utils., 35 F.3d at 624; accord Edward St. Daycare Ctr. v. NLRB, 189 F.3d 40, 46 (1st Cir. 1999) ("The determination of supervisory status vel non, tinged as it is with policy implications, is within the particular expertise of the Board.").

## 1. TSSs

NSTAR contends at the outset that the TSSs' title, "Transmission System Supervisor," in and of itself provides clear evidence that the Acting Regional Director erred in finding that TSSs are not supervisors under the Act. But the Act, by its terms, focuses on what workers are authorized to do, not what they are called. See 29 U.S.C. § 152(11). Titles are merely "secondary indicia of supervisory status" and thus are not alone dispositive.

E.g., Beverly Enters.-Minn., Inc., 348 N.L.R.B. 727, 730 n.10 (2006); see also Jochims v. NLRB, 480 F.3d 1161, 1173-74 (D.C. Cir. 2007) ("[I]t is well settled that 'the status of a supervisor under the Act is determined by an individual's duties, not by [her] title or job classification.'" (quoting Dole Fresh Vegetables, Inc., 339 N.L.R.B. 785, 785 (2003)) (second alteration in original)). Were that not so, an employer could give an employee with no supervisory duties a supervisory title and thereby deny that worker the protection that Congress intended the Act to provide.

Moreover, in this case, the TSSs' title provides quite weak "secondary indicia" of supervisor status. The issue is whether the TSSs supervise "other employees." 29 U.S.C. § 152(11) (emphasis added). The Acting Regional Director took the position that they do not and that, in effect, the TSSs supervise the operations of the transmission system. The TSSs' title, by identifying the TSSs as supervisors of the transmission system, comports with that conclusion. Likewise, the TSSs' prior title -- "Bulk Power System Supply Coordinators" -- did not include the word "supervisor" at all. And there is no indication that NSTAR gave these workers their new TSS title because they had been given new responsibilities to supervise employees.

We thus put to one side the TSSs' title -- and the other secondary indicia on which NSTAR relies -- and focus on the TSSs'

- 18 -

authority.[9]  Specifically, we consider what the record shows about the TSSs' power to exercise the three statutorily-listed supervisory functions at issue -- assign, responsibly to direct, and hire.

### a. Assign

The Acting Regional Director first considered whether TSSs have the power to "assign" other employees, 29 U.S.C. § 152(11).  Relying on Oakwood Healthcare, the Acting Regional Director explained (and NSTAR does not argue otherwise) that the power to "assign" is more substantial than the power merely to "direct."  Specifically, Oakwood Healthcare explained that the

---

[9] This Circuit has never addressed the proper role of "secondary indicia" -- evidence not directly related to the Act's listed supervisory functions -- in the analysis of supervisory status.  The Board has at times relied on such evidence as a "further indicat[ion]" of supervisory status where the evidence also showed that the worker performed a listed supervisory function.  See, e.g., McClatchy Newspapers, Inc., 307 N.L.R.B. 773, 773 (1992); see also E & L Transp. Co. v. NLRB, 85 F.3d 1258, 1270 (7th Cir. 1996) ("Although not determinative on their own, where one of the enumerated indicia in § 152(11) is present, secondary indicia support a finding of statutory supervisor."). Even if secondary indicia are potentially relevant where there is not sufficient evidence to show that the worker in question carries out one of the statutory supervisory functions with independent judgment, we conclude that the Acting Regional Director's determination that the TSS title and the other secondary indicia cited by NSTAR are inconclusive was a reasonable one that is supported by substantial evidence.  We separately discuss the secondary indicia below in considering whether the TSSs are, although not supervisors, "managerial" employees, and our discussion there supplies our reasons for concluding that such indicia also do not suffice, in this case, to make the workers supervisors.

- 19 -

power to assign implicates three distinct types of activities: "designating an employee to a place (such as a location, department, or wing)," "appointing an employee to a time (such as a shift or overtime period)," and "giving significant overall duties . . . to an employee."  Oakwood Healthcare, 348 N.L.R.B. at 689 (emphases added).

### i.  Designating an Employee to a Place

With respect to designating an employee to a place, the Acting Regional Director found that that TSSs did "occasionally dispatch field employees to re-assigned locations . . . and to trouble locations."  The Acting Regional Director, like the Board in Entergy Mississippi, then assumed without deciding that these sorts of directions to go to particular locations to do discrete tasks constitute assignments within the meaning of the statute.[10] See Entergy Miss., 357 N.L.R.B. No. 178, at 7.  For that reason, the Acting Regional Director proceeded to the second part of the supervisor test.  He addressed whether NSTAR had shown that the

---

[10]  The Board had explained in Entergy Mississippi that electrical dispatchers did in a sense assign field employees to places, by telling field employees where to go "[d]uring trouble outages."  357 N.L.R.B., No. 178, at 9.  Entergy Mississippi did not resolve, however, whether that was assignment or ad hoc direction.  The Board held instead that there was no independent judgment involved in any event -- as would be necessary for any assignment power to make the employees into supervisors -- because "the dispatchers utilize a computer program that notifies them of trouble spot locations, and usually assign to trouble spots employees already assigned to that specific area."  Id. at 7.

performance of such tasks -- assuming they amounted to a power to assign -- required the exercise of "independent judgment."

The Acting Regional Director took his definition of "independent judgment" from Oakwood Healthcare.  There, the Board held that "independent judgment" meant that "an individual must at minimum act, or effectively recommend action, free of the control of others and form an opinion or evaluation by discerning and comparing data."  Oakwood Healthcare, 348 N.L.R.B. at 692-93.  As a result, Oakwood Healthcare explained, "judgment is not independent if it is dictated or controlled by detailed instructions, whether set forth in company policies or rules, the verbal instructions of a higher authority, or in the provisions of a collective bargaining agreement."  Id. at 693.  Likewise,

> [i]f there is only one obvious and self-evident choice . . . or if the assignment is made solely on the basis of equalizing workloads, then the assignment is routine or clerical in nature and does not implicate independent judgment, even if it is made free of the control of others and involves forming an opinion or evaluation by discerning and comparing data.

Id.[11]

---

[11] For the reasons we have already given, NSTAR supplies us with no reason not to defer to the Acting Regional Director's interpretation of the supervisor definition in general or of his reliance on Oakwood Healthcare's interpretation of it in particular, including with respect to the meaning of "independent judgment."

We thus proceed to assess whether substantial evidence supports the Acting Regional Director's finding that NSTAR had not shown that this particular power to assign -- assuming it qualified as such -- involved the use of "independent judgment" as Oakwood Healthcare construed those words. The Acting Regional Director explained that NSTAR had not shown that "any . . . judgments" the TSSs made in "routing field employees to outage locations" were "free of the control of others." Rather, the Acting Regional Director found that such judgments were "controlled by detailed instructions." The TSSs, the Acting Regional Director concluded, "must follow established call-out procedures" in telling which field employees where to report. And after the first field employee is sent pursuant to those procedures, "the first responder, a field employee, informs the supervisor or TSS if additional employees are needed," and if so, what type of employee is needed. The Acting Regional Director therefore concluded that the record showed that "the TSSs' routing of field employees to an outage location is nothing more than a routine task," and did not involve "independent judgment."

NSTAR responds by pointing to certain pieces of evidence in the record that might suggest the opposite conclusion. But in doing so, NSTAR does not address the competing record evidence on which the Acting Regional Director relied. One worker familiar with TSS job duties, for example, explained that in deciding which

field employee to send to complete a task, "[t]here's no discretion, you have one [field employee in a geographical area], he's going, that's it." Likewise, a TSS witness explained, a TSS is "not really choosing [between workers]. I mean . . . it's pretty automatic. If the work is scheduled for the North you talk to [the field employee scheduled for the North]. If it's scheduled for the South you talk to [the field employee scheduled for the South]." This TSS witness further explained that this same, "automatic" process applies to unplanned work, which he called "[t]rouble." And while the record shows that TSSs sometimes ask field employees to do tasks outside their assigned areas, the record also shows that this would happen only if the field employee assigned to the area where the task takes place was unavailable, in which case the TSSs would call the next closest field employee.[12]

We thus conclude that the record provides substantial evidence to support the Acting Regional Director's conclusion that NSTAR had failed to show that any assignments the TSSs made by designating an employee to a place required the exercise of

_____

[12] The Acting Regional Director explained that the record failed to show "that the TSSs[] perform an analysis of the field employees' skill set and level of proficiency . . . when routing field employees to an outage location." In contrast, he explained, the Board in Oakwood Healthcare, in finding independent judgment, emphasized that charge nurses found to be supervisors "analyzed the personality of the staff and patients and specific skills or abilities of the nursing staff in making assignments." See Oakwood Healthcare, 348 N.L.R.B. at 697.

independent judgment.  See NLRB v. Hilliard Dev. Corp., 187 F.3d 133, 140 (1st Cir. 1999) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (quoting Am. Textile Mfrs. Inst. v. Donovan, 452 U.S. 490, 523 (1981))).  And so we affirm this finding.[13]

_____

[13] The Acting Regional Director did find that

> in multiple outage situations the TSSs prioritize trouble cases, and based upon the status of a case, can route field employees from one trouble case to another trouble case. In prioritizing such cases, the TSSs consider such things as the number of customers affected, the size of the customer, and the weather.

But the Acting Regional Director then explained that NSTAR had not shown that such determinations were "free from the control of others" rather than "controlled by detailed instructions."  The Acting Regional Director thus found that any assignments that resulted from these prioritization decisions (and the designation to places that they entailed) did not require the use of independent judgment.  It is not immediately clear to us how judgment of the type described by the Acting Regional Director's finding regarding prioritization of trouble spots could be circumscribed by detailed instructions, as the Acting Regional Director found it was.  But NSTAR's brief to us makes no argument based on the Acting Regional Director's finding concerning prioritization discretion during multiple trouble cases.  In fact, NSTAR's argument as to why the Acting Regional Director should have concluded that TSSs assign field employees based on their designating them to places does not mention trouble cases or prioritization discretion at all.  And our own review of the record has turned up little evidence of any sort on whether TSSs made prioritization decisions in the context of multiple trouble cases, let alone how they went about making them when such issues arose.  In the absence of a developed argument from NSTAR contending that this finding by the Acting Regional Director demonstrates that the

### ii.  Appointing an Employee to a Time

The Acting Regional Director next considered whether TSSs have the authority to assign employees by virtue of their power to appoint them to a "time." See Oakwood Healthcare, 348 N.L.R.B. at 689.  The dispute centers primarily on the TSSs' authority to make decisions that lead to field employees working overtime.  See id. (holding that "designating an employee to a[n] . . . overtime period" would constitute an assignment).

The Acting Regional Director found that TSSs' decisions to dispatch field employees to outage locations "can result in overtime expenses for" NSTAR, because the field employees "generally work until the trouble is cleared[,] and even longer if additional outages are anticipated."  The Acting Regional Director explained, however, that a TSS "might authorize overtime" only "after discussion with the field supervisor and/or" the TSS's own supervisor, and that it was "[u]ltimately[] the field supervisors, not the TSSs" who "possess full authority to assign and approve overtime for field employees."  The Acting Regional Director thus concluded that NSTAR had not shown that the TSSs had the authority to assign overtime to field employees.

---

TSSs do have the authority to exercise independent judgment in such circumstances, we treat any such argument as waived.  See Zannino, 895 F.2d at 17.

The Acting Regional Director relied on the Board's reasoning in Entergy Mississippi. See 357 N.L.R.B. No. 178, at 7. The Board found there that while the electrical dispatchers in that case could request overtime, they could not require employees to work it. Id. at 10. And the Board held that the mere request to do so did not amount to an assignment as to time. Id.

NSTAR does not challenge in any developed way the Board's distinction between requesting and requiring overtime for purposes of determining what constitutes "assigning" as to time. We thus look to see if the record contains substantial evidence to support the Acting Regional Director's finding that, as in Entergy Mississippi, the workers in question -- the TSSs -- can request but not require overtime.

One witness, who was a TSS, testified that a field supervisor, not the TSS, made the decision about whether a particular field employee would work later than scheduled. That witness further testified that, as a TSS, he did not "authorize overtime of people in the field," and that only the field supervisor gave such an authorization. And that witness added that he could not overrule a supervisor as a TSS regarding overtime and that "all we can do is ask for it."

The TSSs' supervisor, Conlon, did testify that "especially at the initial stage of it," TSSs could require field employees to work overtime. But Conlon later clarified that he

- 26 -

was "sure" that a TSS who needed overtime from a field employee would discuss it with either a field supervisor or with Conlon first. He also stated that "there's probably always some type of discussion" before overtime is authorized.

NSTAR fails to identify competing evidence that -- in the face of the evidence just reviewed -- compels a conclusion contrary to the one that the Acting Regional Director reached. See NLRB v. Reg'l Home Care Servs., Inc., 237 F.3d 62, 68 (1st Cir. 2001); Hilliard Dev. Corp., 187 F.3d at 140. We thus affirm the Acting Regional Director's determination.

NSTAR does make one additional contention that TSSs assign employees by appointing them to a time. NSTAR contends that TSSs do so "by deciding when work in the field will commence, end, be delayed and recommenced, by sequencing work" and similar actions.

The Acting Regional Director did not explicitly address this argument in finding that TSSs made no assignments as to time. But the Acting Regional Director's reasons for rejecting the argument may be inferred from what the Acting Regional Director did find. In particular, the Acting Regional Director expressly found that TSSs do not assign field employees to regular shifts or reporting times. And the Acting Regional Director further found that TSSs can request, but cannot require, that field employees stay past the end of their shifts to finish a job.

Given those findings, the only remaining possible "times" that TSSs could assign are the start and end times of the particular discrete tasks that whichever field employee is on duty during the relevant period would be required to perform. The Board ruled in Oakwood Healthcare, however, that the authority to sequence work in that way does not constitute a power to assign. See 348 N.L.R.B. at 689 (distinguishing between an assignment "to a certain shift (e.g. night)" and "choosing the order in which the employee will perform discrete tasks" during that shift). And NSTAR made no argument to the Acting Regional Director -- and makes no argument to us -- that Oakwood Healthcare erred in concluding that such sequencing decisions are not assignments.

We thus may infer from the Acting Regional Director's decision that he hewed to the Board's construction of assignments of time in Oakwood Healthcare in finding that the TSSs' sequencing authority did not itself constitute authority to assign. And because the record contains substantial evidence to support a finding that the TSSs held only this sequencing power, we affirm the Acting Regional Director's determination that NSTAR did not show that TSSs can assign other employees to a "time."

### iii. Giving Significant Overall Duties to an Employee

The Acting Regional Director also considered whether TSSs possess the power to assign by virtue of their authority to give "significant overall duties" to field employees. In finding

that NSTAR had not shown that TSSs possess such authority, the Acting Regional Director relied on both Oakwood Healthcare and Entergy Mississippi.

In Oakwood Healthcare, the Board distinguished between giving a worker a broad category of responsibilities, which the Board treated as an assignment, and directing a worker to do a specific task, which the Board did not treat as an assignment (and instead as only a direction). For example, the Board explained that ad hoc instructions like -- in a retail setting -- "restock[] toasters before coffeemakers" did not constitute the assignment of significant overall duties. 348 N.L.R.B. at 689. Or, as the Board also explained, designating a nurse "to be the person who will regularly administer medications to a patient or a group of patients" is an assignment, but telling that nurse "to immediately give a sedative to a particular patient" is not. Id.

Entergy Mississippi then drew on that same distinction. In doing so, it held that the electrical dispatchers in that case did not assign significant overall duties because they gave field employees only what amounted to "ad hoc instruction, i.e., trouble work needing to get done before routine work." 357 N.L.R.B. No. 178, at 12.

NSTAR contends that TSSs do give employees significant overall duties by writing and issuing switching orders. In that regard, NSTAR asserts that "[s]witching orders are perhaps the

farthest thing from ad hoc . . . they are carefully researched and planned work instructions, prepared with deep consideration of the entire system as well as the specific issue to be addressed, conceived with vitally important business and safety concerns." NSTAR further points out that the most complex switching orders can take days, or even weeks, to execute.

But, as the Acting Regional Director explained, "field employees receive their daily assignments from their direct supervisors," not from TSSs.[14] And it is those daily assignments that tell field employees where they need to be, and when, to conduct whatever switching operations are planned for that day. The switching orders, by contrast, relay a set of specific, individual actions that field employees must take to successfully complete the overall duties their field supervisors have assigned them.

Given the deference we owe the Acting Regional Director's expertise in defining the bounds of the supervisor definition, see Ne. Utils., 35 F.3d at 624, we find his application

---

[14] NSTAR criticizes the Acting Regional Director for stating that TSSs get the information on which employee is assigned to what overall tasks from a computer program called "TOA." That particular program, NSTAR tells us, is one that STOCs use, not TSSs, and that program, NSTAR adds, contains outage schedules, not field employee schedules. But the record supports the Acting Regional Director's statement, and in any event, it is undisputed that TSSs were informed by field supervisors, if not via TOA then by some other means, as to which field employees the field supervisors had scheduled to execute the planned work.

of the distinction on which <u>Oakwood Healthcare</u> and <u>Entergy Mississippi</u> relied to the switching orders in this case to be a supportable one. And thus, we affirm the Acting Regional Director's finding that NSTAR did not show that the TSSs have the power to assign significant overall duties.

### b. Responsibly to Direct

The next supervisor function the Acting Regional Director addressed is the power "responsibly . . . to direct" other employees. 29 U.S.C. § 152(11). Here, the Acting Regional Director relied on the "accountability definition" of responsible direction the Board adopted in <u>Oakwood Healthcare</u>, 348 N.L.R.B. at 691-92, and then applied to electrical dispatchers in <u>Entergy Mississippi</u>, 357 N.L.R.B. No. 178, at 6.[15]

The Board held in <u>Oakwood Healthcare</u> that "[f]or direction to be responsible, the person directing . . . must be accountable for the performance of the task by the other, such that some adverse consequence may befall the one providing the oversight if the tasks performed by the employee are not performed properly." 348 N.L.R.B. at 691-92. In particular, the employee

---

[15] The Acting Regional Director also found that NSTAR had not shown that the TSSs engage in any "direction" of any kind. But we need not address that finding, because even if the Acting Regional Director was wrong, and NSTAR did show that the TSSs "direct" other employees, that error would be of no consequence if -- as we conclude -- the Acting Regional Director supportably determined that any direction the TSSs undertake was not "responsible."

engaged in responsible direction must have not only the "authority to direct the work and the authority to take corrective action," but also the "prospect of adverse consequences . . . if he/she does not take these steps."  Id. at 692.  That definition, the Board explained, protects the organizing rights of those employees "whose interests, in directing other employees, is simply the completion of a certain task."  Id.

Entergy Mississippi then applied this accountability definition.  In doing so, the Board in that case held that electrical dispatchers who had "the authority to direct field employees in the step-by-step instructions of a switching order," but who were not "accountable for the actions of field employees they direct," did not engage in responsible direction.  Entergy Miss., 357 N.L.R.B. No. 178, at 7.  Rather, the Board concluded that "the dispatchers are accountable for their own work, i.e., their own failures and errors, and not those of the field employees."  Id. at 8.  NSTAR makes no argument that this accountability-based distinction between responsibility for the work of others and responsibility for one's own work is incompatible with the Act's supervisor definition.[16]  Thus, the

_____

[16] Moreover, our own Northeast Utilities decision accords with this distinction. 35 F.3d 621 (1st Cir. 1994).  In Northeast Utilities, we affirmed the Board's conclusion that a group of electrical workers called "Coordinators" -- employees similar to TSSs -- did not responsibly direct field employees.  Id. at 625. In doing so, we applied a "responsible direction" standard that

- 32 -

only issue for us is whether substantial evidence supports the Acting Regional Director's finding that NSTAR had not met its burden of showing that "TSSs are accountable for their actions in directing field employees." We conclude that record does support that finding.

The Acting Regional Director acknowledged that Conlon, the TSSs' manager, testified that "TSSs can be and have been held accountable for field employee deficiencies." But the Acting Regional Director reasonably concluded that assertion was "simply a conclusion without evidentiary value," and that "[t]he record lack[ed] evidence that any TSS or STOC ha[d] been disciplined for failure to oversee or correct a field employee, or as a result of a field employee's failure to adequately perform her/his duties."

The Acting Regional Director also gave little weight to an incident on which NSTAR relied heavily and that involved a TSS being written up negatively, apparently by a supervisor. Specifically, Conlon recounted a situation in which a TSS "did not properly perform all nine steps of the required pre-switching brief prior to issuing the switching order," but in which the field employee executing that order then did something that caused a breaker to trip that should not have tripped.

---

also emphasized accountability. See id. We explained that although "[t]he Coordinators in this case may direct [other employees,] . . . they are not responsible for what [those] employees actually do." Id.

But the Acting Regional Director supportably found that the TSS was held responsible in this instance for how he did his own work and not for how the field employee did his. Conlon testified that any decrease in the TSS's compensation based on this incident would be "as a result of the switching error that [the TSS] was involved in directly," rather than as a result of the field employee's error. And later, Conlon testified that he had not held any of the TSSs or STOCs "accountable on paper, as a negative on paper in their appraisals, for the field personnel having committed some error."

NSTAR does argue that the Acting Regional Director erred in emphasizing the lack of evidence "that any TSS or STOC has been disciplined" for a supervisory failure. But the Acting Regional Director did not decide that an employee must actually be disciplined -- rather merely face the prospect of discipline -- in order to be found to responsibly to direct other employees. The Acting Regional Director focused instead on what the record showed about why the TSS was disciplined in this one instance on which NSTAR relied. And the Acting Regional Director did so only in the course of applying the distinction the Board made in Oakwood Healthcare and Entergy Mississippi between accountability for one's own error and accountability for the error of another.

Finally, NSTAR argues that the TSSs have the authority "responsibly to direct" other workers based on evidence that the

- 34 -

TSSs' bonuses reflect, among other things, "the manner in which they have managed projects in the field." Substantial evidence, however, supports the Acting Regional Director's finding that NSTAR did not show that TSSs' bonuses suffice to make TSSs' direction of field employees into "responsible" direction.

Conlon did testify that the TSSs are evaluated based on achievement of "outage scheduling goals," and that without field personnel work, those goals could not be achieved.[17] But even NSTAR acknowledges that a TSS's ability to meet his or her goals is in significant part "determined by how the TSS decides to structure a job," and thus by the TSS's own performance. Moreover, Conlon provided no details to back up his statement, and he conceded that he "didn't think there were any" examples of TSSs or STOCs ever in fact having been held accountable for "field personnel problems." In fact, with respect not only to switching orders but also to "all other work episodes in which the TSSs or [STOCs] had some role in directing work of some field personnel," Conlon conceded that he had found no examples "suggesting that TSSs or [STOCs] were held accountable for the misdeeds of field personnel." Thus, we affirm the Acting Regional Director's finding

---

[17] Specifically, Conlon testified that "the reality of the situation" was that if the field employees "didn't get all their work done, . . . then it would reflect on my goals, my performance plan." We assume that although Conlon used the first person, he meant to refer to TSSs' goals and performance plans.

that NSTAR failed to show that TSSs have the authority "responsibly to direct" other workers.

### c.  Hire

The last supervisory function that the Acting Regional Director considered was the authority to "hire" (or to "effectively . . . recommend" the hiring of) other employees.  29 U.S.C. § 152(11).  The Acting Regional Director supportably found that NSTAR had not shown that TSSs have such authority.

The sole point of dispute concerns whether the TSSs have the authority to "effectively recommend" the hiring of other TSSs. 29 U.S.C. § 152(11); see Empress Casino Joliet Corp. v. NLRB, 204 F.3d 719, 721 (7th Cir. 2000) (finding such authority where the uncontradicted testimony showed that "the captains and first mates interviewed job applicants and that [the official with final hiring power] relied heavily on their recommendations").  But wherever the line between non-supervisory involvement in hiring and an "effective[] recommend[ation]" to hire may fall, the Acting Regional Director reasonably concluded that it was not crossed here.

NSTAR relies on Conlon's testimony once again.  Conlon testified that he introduced applicants for TSS positions to the current TSSs at the end of the applicant's job interviews.  But significantly, Conlon did not describe the TSSs' role in the hiring process as a job interview, even though he described himself as

conducting "interviews" with the candidates. Rather, Conlon testified that his purpose in having TSSs sit with job applicants was to give the applicant "a feel for the job . . . and just give [the current TSSs] a feel for the person that's coming in for an interview." And Conlon said he did not seek to have any particular TSSs meet with the applicant; "it's just whoever's on that day."

Conlon also testified that, afterwards, he would ask the TSSs what they thought of the applicant. And Conlon testified that he did not recall ever hiring someone whom the current TSSs did not favorably describe. Nor did Conlon recall ever not hiring someone whom the current TSSs did favorably describe.

But Conlon testified that the questions he asked of the TSSs who had happened to meet with candidates were general ones: "Say what do you think of this guy? Do you think he'll fit in? Do you think -- you know, does he know it? Does he get what's going on?" And Conlon could not remember any "specific person[]" whom he had declined to hire based on TSS feedback. Moreover, while Conlon testified that the last three TSSs he hired had been well-liked by the current TSSs with whom they spoke, Conlon could not recall the names of those TSSs nor any details on the nature of the feedback those TSSs had offered.

It is thus not clear on this record how significant, if at all, the TSSs' impressions were to Conlon's hiring decisions. And, as a result, we conclude that the Acting Regional Director

supportably found that NSTAR failed to meet its burden of establishing that the TSSs' role in hiring rises to the level of an effective recommendation sufficient to render it supervisory.

### d.  Shedding Load

Finally, we reject NSTAR's contention that TSSs' authority to take an action known as "shedding load" is a "salient fact" that makes TSSs into supervisors.  "Shedding load" involves intentionally cutting power to an area in order to preserve the transmission system's stability.  TSSs do possess the authority to "shed load," although no TSS has ever done so.  And TSSs do appear to have the power to use independent judgment in making such a decision and thus in directing others to assist in implementing it.

The Acting Regional Director's discussion of load shedding was brief, and he did not explicitly lay out his reasoning for rejecting NSTAR's contention that load shedding authority makes TSSs into supervisors.  But his reasoning can be inferred from his decision as a whole.

In particular, after the Acting Regional Director described the existence and extent of load shedding authority, he then went on to conclude that NSTAR had not shown that TSSs use independent judgment in designating employees to places, nor that TSSs appoint employees to times, give them significant overall duties, or responsibly direct them.  The Acting Regional Director

thus necessarily found that NSTAR failed to show that load shedding involved any of those powers.  And the record supports that finding.

NSTAR does not offer any explanation for how load shedding involves TSSs designating employees to places in a way distinct from the way TSSs make such designations in "trouble" cases, which, as explained above, the Acting Regional Director supportably found does not require the use of independent judgment. Likewise, NSTAR does not explain how load shedding would involve giving employees significant overall duties.

NSTAR does contend that TSSs have the authority to "direct others to implement" actions necessary to shed load.  But direction must be "responsible" to be supervisory, Oakwood Healthcare, 348 N.L.R.B. at 692, and NSTAR offers no argument (beyond the general one already addressed above) as to what in the record shows that TSSs' power to direct others in the load shedding context meets the Board's accountability definition of "responsible direction" as articulated in Oakwood Healthcare.

Thus, the fact that some aspects of load shedding may require the exercise of what the Act terms "independent judgment" is beside the point.  For under the Act's supervisor definition, it is only when a worker performs a listed supervisor function that we then must determine whether its exercise requires the use of "independent judgment."  And for that reason, we reject NSTAR's

contention that the TSSs' authority to shed load compelled the Acting Regional Director to conclude that the TSSs are supervisors.

## 2.  STOCs

We now turn to the findings regarding the supervisor status of the STOCs.  The STOCs are more senior than the TSSs, but the Acting Regional Director concluded that NSTAR also failed to show that they were supervisors.  And we affirm that finding as well.[18]

NSTAR points to no evidence in the record showing that STOCs interact with field employees (other than when they stand in for TSSs), much less showing that STOCs assign or responsibly direct such employees.  NSTAR's argument that STOCs are supervisors is instead based on the assertion that STOCs "determin[e] which work projects are to be completed and the sequencing of those projects."  NSTAR contends that STOCs' sequencing and project-management decisions have downstream effects on field personnel, insofar as some projects require different types of field employees.  For example, NSTAR argues that a STOC's decision to schedule a particular project for a particular date may lead field supervisors to schedule field employees to work on that date.

---

[18] In fact, NSTAR's primary argument for why STOCs are supervisors is that STOCs often perform the duties of the TSSs. Needless to say, that argument is of no help to NSTAR given that substantial evidence supports the Acting Regional Director's conclusion that NSTAR failed to show that the TSSs are supervisors.

But there is no evidence in the record that STOCs themselves assign the employees who will complete the projects that the STOCs schedule.  Rather, as the Acting Regional Director found, it is the field supervisors, not the STOCs, who assign employees to complete scheduled work.  Likewise, there is no evidence in the record that STOCs direct field employees to take any discrete tasks (much less evidence that STOCs do so "responsibly").  We thus defer to the Acting Regional Director's determination that NSTAR failed to show that STOCs have the supervisory powers to assign and responsibly direct field employees.

NSTAR also contends that STOCs have the authority to "hire" other employees.  But the only evidence about STOC hiring came in the testimony of Conlon, the TSSs' and STOCs' manager, and it was equivocal at best.  Conlon testified that STOCs "could be" involved in hiring, but that he could not "actually remember if they were . . . or not."  In light of that testimony, we defer to the Acting Regional Director's determination that STOCs, like TSSs, have no power to "hire."

### 3.  Additional Arguments

NSTAR does argue at length that both TSSs and STOCs use significant judgment in the course of their employment.  NSTAR also argues that TSSs in particular have the power to tell other

workers to take particular actions. And NSTAR points to significant record evidence in support of each of those arguments. But while TSSs and STOCs are clearly highly skilled workers who sometimes tell other workers what to do, "direction" is a supervisory function only if it is "responsible direction," Oakwood Healthcare, 348 N.L.R.B. at 692, or if it becomes so substantial that it amounts to a power to "assign." And, further, the exercise of independent judgment makes a worker into a supervisor only if the worker exercises such judgment in connection with a supervisory function. Thus, using complex judgment to direct does not itself suffice to make one a supervisor.

Likewise, we do not find persuasive NSTAR's contention that the Acting Regional Director erroneously relied on "dismissive quantifications" to describe TSS and STOC duties, thereby supposedly "ignor[ing] the legal import" of TSS and STOC roles "by arguing that the instances simply do not occur often enough." NSTAR is right that even a rarely exercised power can make a worker into a supervisor. See Me. Yankee Atomic Power Co. v. NLRB, 624 F.2d 347, 360 (1980). But, when considered with care, the record shows that the Acting Regional Director did not conclude that, because such powers were used with limited frequency, they cannot count as supervisory functions under the Act. Instead, we read the Acting Regional Director to have supportably found that NSTAR failed to show that the TSSs and STOCs have the authority to

exercise any such functions or -- in the case of one sort of power to assign -- that NSTAR failed to show that the TSSs and STOCs are required to exercise independent judgment in exercising any such function.  We thus affirm the Acting Regional Director's findings that the TSSs and STOCs are not supervisors.

### III.  Managerial Exclusion

Even if TSSs and STOCS do not qualify as supervisors, they may nonetheless fall within the Act's exclusion of "managerial employees."  The Supreme Court offered its most thorough guidance as to the scope of this exclusion in NLRB v. Yeshiva University, 444 U.S. 672 (1980).

The Supreme Court held there that "an employee may be excluded as managerial only if he represents management interests by taking or recommending discretionary actions that effectively control or implement employer policy."  Id. at 683.  The Court further explained that "employees whose decisionmaking is limited to the routine discharge of professional duties in projects to which they have been assigned cannot be excluded from coverage," and that "[o]nly if an employee's activities fall outside the scope of the duties routinely performed by similarly situated professionals will he be found aligned with management."  Id. at 690.  The Court also noted that, under this rule, "architects and engineers functioning as project captains for work performed by teams of professionals are deemed employees despite substantial

planning responsibility and authority to direct and evaluate team members."[19]   Id. at 690 n.3.

The Acting Regional Director found that the TSSs and STOCs were not managerial employees.  NSTAR does not identify any legal error the Acting Regional Director made in interpreting this exclusion.  The sole issue for us, therefore, is whether substantial evidence supports the Acting Regional Director's determination that NSTAR failed to meet its burden of showing that TSSs and STOCs are managerial, as the Acting Regional Director applied that term.  We conclude that substantial evidence does support that finding.

**A.   TSS**

NSTAR contends that TSSs are managerial employees because the record shows they may purchase additional electrical generation on behalf of NSTAR, revise standard operating

---

[19]   Kentucky River did hold, with respect to the separate statutory exclusion of "supervisors," that the fact that judgment was "professional or technical" was irrelevant to whether it was "independent" as that word is used in the supervisor definition. 532 U.S. at 713.  The managerial exception, however, is simply a gloss on the meaning of the word "employee" and does not involve the word "independent" at all.  There is thus no reason to believe that Kentucky River undermined this portion of Yeshiva University. Cf. Evergreen Am. Corp. v. NLRB, 362 F.3d 827, 838 (D.C. Cir. 2004).  And in any event, NSTAR makes no argument that Kentucky River did have that effect.

procedures, and their "loyalty lies with management, not the rank-and-file."[20] We consider each contention in turn.

With respect to TSSs' power to purchase electricity, the Acting Regional Director concluded that their "occasional actions in . . . requesting excess generation from utilities d[id] not rise to the level of formulating and effectuating management policies." The Acting Regional Director thus distinguished TSSs from workers that the Board had found to be managers based on their purchasing power. See Simplex Indus., Inc., 243 N.L.R.B. 111, 112-13 (1979); Cent. Me. Power Co., 151 N.L.R.B. 42, 44 (1965). In those cases, the Acting Regional Director explained, the workers' purchasing power had been more significant than the TSSs' power, and less guided by employer policies.

NSTAR challenges the Acting Regional Director's finding only by contending that the Acting Regional Director erred in distinguishing Simplex Industries and Central Maine Power. NSTAR contends that in this case, as in those, there was no evidence of

---

[20] As for TSSs' authority to "shed load," which is unquestionably of great significance to NSTAR, we note that the record shows, and NSTAR concedes, that regulations required NSTAR to give such authority to the TSSs. That suggests that under the Supreme Court's Yeshiva University decision, the TSSs' possession of such authority is not beyond "the scope of the duties routinely performed by similarly situated professionals" and as such not managerial. 444 U.S. at 690. In any event, NSTAR does not mention load shedding in contending that the TSSs are managers in its brief to us, and so NSTAR has waived any contrary argument. Zannino, 895 F.2d at 17.

- 45 -

an employer policy governing the purchases at issue. But we conclude that substantial evidence supports the Acting Regional Director's conclusion that the workers in Simplex Industries and Central Maine Power are distinguishable from the TSSs.

The record indicates that TSSs' authority to purchase power is very different from the authority of the workers in Simplex Industries and Central Maine Power. The workers in those cases had the authority to make discretionary purchases that, in the workers' views, would best serve their employer's economic needs. See Simplex Indus., 243 N.L.R.B. at 112-13; Cent. Me. Power, 151 N.L.R.B. at 44. TSSs' purchasing authority involves no similar discretionary exercise of unguided economic judgment about how to serve their employer's financial interests. To the contrary, the record suggests that TSSs have the authority to purchase power only when doing so is necessary to alleviate instability in the transmission system. In fact, there was testimony that TSSs were instructed to affirmatively ignore the financial impact of all their choices.[21] A TSS testified that "economic consideration" played "[v]ery little . . . I would almost say no[]" role in his decision-making, because, under their

_____

[21] The extent of that impact is, in any event, unclear. The TSSs' manager, Conlon, testified that the TSSs decide whether to purchase additional electrical power to ensure a stable transmission system, which has the effect of "bringing on a more expensive unit." But the record does not reflect how often such purchases occur, or how financially significant they are to NSTAR.

regulatory license "we're supposed to operate the system reliably and safely and not factor in economics to any decisions we make." And in the sole example in the record of a TSS having purchased power, the TSS did so because a piece of NSTAR's transmission equipment had malfunctioned and caused overloading of NSTAR's other transmission equipment, which the purchase of electricity alleviated.

We thus conclude that the Acting Regional Director reasonably determined TSSs' limited purchasing authority -- unlike the more discretionary authority involved in Central Maine Power and Simplex Industries -- "d[id] not rise to the level of formulating and effectuating management policies." And our conclusion is reinforced by this Court's decision in Northeast Utilities, which likewise involved electrical workers who had some authority to purchase electricity. 35 F.3d at 626.

In Northeast Utilities, this Court affirmed the Board's determination that "pool coordinators" responsible for "buying and selling power among the member utilities as economically as possible while avoiding power outages" were not managers. 35 F.3d at 623. We explained that operating policies that the coordinators did not set governed their purchasing decisions. Id. at 626. Beyond a "common goal of keeping the lights on," we found no "congruence of interests between the Company and the Coordinators sufficient to warrant the latter's exemption from the Act" as

managers.  Id.  We conclude that the Acting Regional Director reasonably made the same determination with respect to TSSs.

NSTAR next argues that TSSs' role in revising standard operating procedures makes them managers.  But substantial evidence supports the Acting Regional Director's finding that such revisions were made "according to, and consistent with, established policy," and that the TSSs "do not possess the authority to set policies according to their own independent discretion."

The TSSs' manager, Conlon, testified that TSSs had updated some guides containing certain of the standard operating procedures that TSSs follow.  But no evidence reveals the form that the TSSs' work on updating such procedures took.  And without such evidence, it is impossible to know whether the TSS were making new policy in updating an old procedure, or merely clarifying an existing policy.  We therefore affirm the Acting Regional Director's conclusion that NSTAR failed to show, as was its burden, that TSSs' role in revising standard operating procedures involved the setting of management policy.

Finally, NSTAR contends that the Acting Regional Director overlooked evidence about "TSSs' own perspective about being managerial."  NSTAR relies on a self-evaluation form that a

single TSS completed as part of his annual review.[22]  In that form, the TSS emphasized his efforts to "[o]perate within [the] departmental operating and transmission budget" and his "aware[ness] of overtime and budgets."

But such statements do not necessarily indicate that TSSs have a managerial status.  Nor does NSTAR cite any case or Board decision finding comparable statements sufficient to make workers into managers.  And thus, NSTAR's contention is inadequate to undermine the Acting Regional Director's decision that TSSs are not managerial employees.

### B.  STOCs

NSTAR contends that the STOCs are managerial employees primarily due to their role in coordinating planned transmission system work.  NSTAR also points to STOCs' role in revising standard operating procedures, and to STOCs' attendance at certain meetings.  We begin with the "coordinating" issue.

---

[22] While NSTAR relies solely on that single form, other indicia in the record -- TSSs' pay scales, severance packages, and attendance at certain meetings -- might reasonably be seen as suggesting a similar point, namely, that NSTAR treats TSSs differently from existing unionized employees, and expects different things from them.  But such differential treatment does not establish that TSSs "represent[] management interests by taking or recommending discretionary actions that effectively control or implement employer policy," as is necessary for them to be excluded from the Act's definition of "employee."  Yeshiva Univ., 444 U.S. at 683.

The record contains substantial evidence to support the Acting Regional Director's conclusion that STOCs' role "does not rise to the level. . . of expressing and making operative decisions on behalf of the[ir] [e]mployer."  In particular, the record shows that NSTAR's management policy concerning what transmission system work NSTAR will perform each year is contained in an annual "work plan."  And the record is clear that STOCs have no role in drafting this work plan.[23]

The record also contains substantial evidence supporting the Acting Regional Director's finding that any revisions to standard operating procedures that STOCs made did not involve setting management policy.  Rather, the record shows that such revisions involved changing the written operating procedures to more clearly and accurately reflect NSTAR's pre-existing policies, not to change NSTAR's policies.

In particular, a STOC described his update to a guideline as involving "a better way to . . . get the point across and make it a little easier for people to understand."  Moreover, the STOC said that he had merely "recommended" the change to the guideline

---

[23] For example, a STOC testified that he had no role in putting together the plan.  And another STOC testified that "the system planning group" -- on which no STOC or TSS sat -- would decide what work would be done, and would assign a "project manager" -- still not a STOC or a TSS -- to "oversee the project."  Only then -- and subject to such oversight -- would the project get "scheduled with" a STOC.

to some unspecified other person, who then made the decision to adopt his changes.  Consistent with that view, Conlon, the STOC's manager, described a STOC as having "influence without authority" in revising an operating guide.  And Conlon listed a number of other groups involved in the revision process.

That brings us to NSTAR's final argument. NSTAR contends that STOCs participate in "many different management-only meetings," and that this participation shows that they have managerial authority. But as the Acting Regional Director explained, the record does not show that the STOCs' role in those meetings included the authority to "pledge or commit [NSTAR] to any recommendations made by the groups" or otherwise themselves set NSTAR's policy.  To the contrary, as the Acting Regional Director went on to explain, the record shows that "[a]ny recommendations reached in the task forces that the . . . STOCs attend . . . are subject to managerial review and approval" by higher-level workers at NSTAR.

For example, a STOC testified that when the task force he participates in "reaches a recommendation," the task force then presents that recommendation to another, higher level task force, which will either accept or reject it.  And, the STOC testified, no STOC participates in that higher level task force, though Conlon, the TSSs and STOCs' own manager, is a member of it.  Thus,

we conclude that the Acting Regional Director reasonably found that NSTAR had not shown that the STOCs are managers.

Our conclusion on this point finds further support in our decision in Northeast Utilities.  35 F.3d at 626.  In that case, we referred to a "paucity of evidence tending to show managerial powers," given that management policy seemed to be set by a committee that the employees at issue were not part of.  Id. The same could equally be said in this case.  The record supports the conclusion that a committee that does not include STOCs develops the work plan that the STOCs implement.  The record also supports the conclusion that STOCs participate in groups that simply make recommendations to higher-level employees who have authority.  The record thus does not show that STOCs wield managerial powers.

## IV.  Conclusion

For the foregoing reasons, we grant the Board's application for enforcement of an unfair labor practice charge against NSTAR, and deny NSTAR's cross-petition for review.