United States v. Wallace

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2018

(Argued: October 18, 2018          Decided: September 3, 2019)

Docket No. 17-0472

———————————————————————

UNITED STATES OF AMERICA,

*Appellee*,

v.

TIMMY WALLACE,

*Defendant-Appellant*.

———————————————————————

Before:

WINTER, POOLER, *Circuit Judges*, and ABRAMS, *District Judge*.*

Defendant-Appellant Timmy Wallace appeals from a judgment of conviction entered on February 13, 2017 in the United States District Court for the Southern District of New York (Katherine B. Forrest, *J.*). Wallace was convicted after a two-day jury trial of one count of possessing a firearm and ammunition after having been convicted of three serious drug offenses, in violation of 18 U.S.C. §§ 922(g)(1), 924(e)(1), and 2. His principal argument on appeal is that the District Court erred in denying his motion to suppress the firearm, because it was discovered as the result of an unconstitutionally prolonged traffic stop. Wallace also challenges several of the District Court's factual findings and argues that he was improperly sentenced pursuant to the enhanced sentencing provisions of the Armed Career Criminal Act ("ACCA"). We affirm both the District Court's denial of the motion to suppress and Wallace's sentence under ACCA.

_____

* Judge Ronnie Abrams, of the United States District Court for the Southern District of New York, sitting by designation.

Judge Pooler dissents in a separate opinion.

AFFIRMED.

SAGAR K. RAVI (HAGAN SCOTTEN, *on the brief*) *for* Geoffrey S. Berman, UNITED STATES ATTORNEY FOR THE SOUTHERN DISTRICT OF NEW YORK, New York, N.Y.

JONATHAN I. EDELSTEIN, EDELSTEIN & GROSSMAN, New York, N.Y., *for* Timmy Wallace.

RONNIE ABRAMS, *District Judge*:

Defendant-Appellant Timmy Wallace appeals from a judgment of conviction entered on February 13, 2017, in the United States District Court for the Southern District of New York (Katherine B. Forrest, *J.*). Wallace was convicted after a two-day jury trial of one count of possessing a firearm and ammunition after having been convicted of three serious drug offenses, in violation of 18 U.S.C. §§ 922(g)(1), 924(e)(1), and 2. The District Court determined that Wallace was subject to the enhanced sentencing provisions of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(1), and sentenced him principally to 15 years of imprisonment to be followed by one year of supervised release. On appeal, Wallace argues that the District Court erred in denying his motion to suppress the firearm and improperly sentenced him under ACCA. We reject both arguments and affirm the judgment of conviction.

## BACKGROUND

**I.      Factual Background**[1]

On the evening of May 25, 2015, Officers Harris Haskovic, Michael Monahan, and Sergeant David Alston were traveling in a patrol car near the corner of Webster Avenue and East 173rd Street in New York City.  At approximately 7:20 p.m., they observed a defective brake light on the vehicle in front of them and pulled the vehicle over.

Haskovic and Monahan approached the vehicle, while Alston remained in the patrol car.  As they approached, the officers observed scratches and dents all around the car and broken glass on the windshield.  They noticed a pizza delivery sign on the top of the vehicle and two passengers in the backseat.  When the officers asked the driver, Wallace, for his driver's license and registration, Wallace provided his license, but stated that he did not have a copy of his registration.

While standing next to the vehicle, the officers observed scratch marks and chipped paint on the top right corner of the driver's side door.  The damage indicated to both officers that someone had pried open the door in order to forcibly enter the vehicle.  The officers further observed that the registration sticker and inspection

---

[1] Unless otherwise noted, the factual background is drawn from the factual findings and credibility determinations of the District Court.

certificate on the windshield were damaged and faded. Both stickers appeared to have been peeled off and taped back onto the windshield.

The officers asked Wallace about the condition of the stickers. Wallace stated that the damage had been caused by a defogging spray—an explanation that Haskovic testified was inconsistent with his personal experience with defogging agents. Haskovic and Monahan also asked Wallace about the scratch marks on the top right corner of the driver's side door. Wallace responded that the damage was caused on a prior occasion when he forcibly entered his vehicle after locking himself out of it.

Because of the damage to the registration sticker, the Vehicle Identification Number ("VIN") printed on the registration sticker was only partially visible. The VIN is a 17-digit number that uniquely identifies each vehicle and is required by law to be printed on each vehicle in multiple locations. 49 CFR § 565.13. Among other locations, the VIN must be printed on the vehicle's registration sticker and on the Federal Label, which is a sticker affixed to the "hinge pillar, door-latch post, or the door edge that meets the door-latch post, next to the driver's seating position" (the "doorjamb"). 49 C.F.R. § 567.4. Another VIN—referred to as the "Public VIN"—must also be printed somewhere inside the passenger compartment, in a location visible to a person "whose eye-point is located outside the vehicle adjacent to the left windshield pillar." 49 C.F.R. §565.13(f). Although the VIN on Wallace's registration

sticker was only partially legible, the officers were able to view the full Public VIN—which was displayed on the dashboard—from the outside of the car.

On a lawfully owned and registered vehicle, the VIN printed on one location will be identical to the VIN printed on every other location throughout the vehicle. The same is not necessarily true of a stolen vehicle. Haskovic testified at the suppression hearing that he had been trained in auto crime school about a technique known as a "VIN swap," whereby a VIN from one vehicle is removed and placed onto a stolen vehicle of a similar make and model. Monahan and Alston testified similarly about VIN swaps. In the case of a VIN swap, the VIN that is publicly visible—printed on the vehicle's registration sticker and/or dashboard—may fail to match up with the VIN printed on other locations throughout the vehicle, which may be more difficult to locate or impossible to remove. A successful VIN swap will disguise auto theft if the police, when running a report on the vehicle, rely exclusively on the VIN that is publicly visible, rather than cross-checking that number with an additional VIN.

Given their knowledge of VIN swaps and the various suspicious circumstances at the scene—the signs of forced entry, Wallace's missing registration, and the damaged and taped-on condition of the registration and inspection stickers—Haskovic and Monahan suspected that Wallace's vehicle may have been stolen. The officers thus decided to check if the VIN that was printed on the dashboard matched

up with another VIN printed elsewhere on the vehicle. Because the VIN printed on the registration sticker was only partially legible, they decided to check the VIN that is required to be printed on the Federal Label affixed to the doorjamb. Haskovic, accordingly, asked Wallace if he could open the driver's side door. Wallace consented and, upon opening the car door, the officers observed that the Federal Label was missing. After questioning Wallace about the missing Federal Label, the officers arrested Wallace for violating section 170.70 of the New York Penal Law ("NYPL"), which prohibits "knowingly possess[ing] . . . a vehicle or vehicle part from which a vehicle identification number label, sticker, or plate has been removed[.]" The arrest occurred at approximately 7:29 p.m.

Seven minutes earlier, at approximately 7:22 p.m., one of the officers at the scene searched Wallace's name through law enforcement databases using a portable electronic device called a Rugby. The Rugby device returned a report that displayed, among other information, Wallace's driver's license, license plate, and VIN. The information in the report matched the VIN on the dashboard, Wallace's driver's license, and the license plate that the officers observed at the scene.

Although it is clear that the report was run at 7:22 p.m., and that the traffic stop concluded at 7:29 p.m., it is not clear when the Rugby report was run in relation to the other events that occurred during the traffic stop. It is also not clear which of the officers ran the Rugby report. At the suppression hearing, Haskovic and Monahan

6

both testified that they did not recall a Rugby report having been run at the scene. Alston testified that he knew a Rugby report was run, but that he could not recall who ran it and never saw the results. Alejandro Azcona, an officer who had pulled over to assist during the traffic stop, testified that when he arrived at the scene, he gave his Rugby device to Haskovic, because none of the officers present had one. He further testified, however, that he could not recall whether any of the officers had used the device to run a report on Wallace.

After arresting Wallace, Haskovic drove Wallace's car back to the precinct, vouchered it as arrest evidence, and he and Monahan performed an inventory search of the vehicle. Pursuant to the standard procedures for inventory searches, Haskovic searched under the hood of the car. While doing so, Haskovic had the added purpose of searching for another VIN, which he expected to be printed on either the engine block or transmission. Upon opening the hood of the car, Haskovic saw a black grocery bag hanging behind the passenger side headlight. He picked up the bag and, inside it, found another bag, which was zipped closed. Haskovic unzipped the bag and saw the butt of a handgun. After notifying Monahan and Alston, and conferring with the evidence collection team, Haskovic vouchered the firearm and completed the inventory search.

7

## II. District Court Proceedings

On November 12, 2015, Wallace was charged by Information with one count of possessing a firearm and ammunition after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 2. On March 29, 2016, the Superseding Indictment was filed, charging Wallace with the same offense, but further alleging that his three prior drug convictions rendered him subject to the enhanced sentencing provisions of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(1). Wallace moved to suppress the firearm, his DNA found on the firearm, and the statements he made after the arrest. On July 12 and August 1, 2016, the District Court held a suppression hearing. Haskovic, Monahan, Alston, Azcona, and Wallace all testified, as did an investigator who conducted a brake light test on Wallace's vehicle, as well as a sergeant who determined that the Rugby report had been run at the scene of the traffic stop at 7:22 p.m.

After the hearing, the District Court denied Wallace's motion to suppress in a written opinion. The District Court found that the officers' testimony was "generally credible" and that Wallace's testimony was "generally not credible." The Court explained that, at the suppression hearing, Wallace "had a flat affect," "showed little to no emotion," and had a general demeanor that was "unsupportive of someone who was being completely forthcoming." The Court specifically discredited several portions of Wallace's testimony, including his explanation for the damaged condition

8

of his registration and inspection stickers. By contrast, the Court specifically credited portions of the officers' testimony, including Haskovic's testimony about his training on VIN swaps and the officers' testimony that Wallace had consented to the opening of his car door.

The District Court made several specific factual findings, including that Wallace had been driving with a defective brake light, that he had consented to the opening of his car door, that he knew his vehicle was missing a Federal Label, and that Haskovic was both conducting an inventory search and looking for an additional VIN when he found the firearm under the hood of Wallace's car. The Court held that the traffic stop was lawful at its inception and that, at the time of the arrest, the officers had probable cause to believe that Wallace had violated NYPL § 170.70. The Court further held that the firearm was discovered during a lawful inventory search, and that Wallace's additional investigatory purpose of searching for the VIN did not affect the legality of that search. Accordingly, the District Court denied Wallace's motion to suppress.

After a two-day trial in September of 2016, the jury returned a guilty verdict. On February 10, 2017, the District Court held a sentencing hearing. The District Court determined that Wallace had been convicted of at least three prior offenses which constituted "serious drug offenses" within the meaning of ACCA. First, Wallace had been convicted in 1998 of two separate counts of attempted criminal sale of a

9

controlled substance in the third degree. He was sentenced for both of these convictions in April of 1999 and the parties refer to these two convictions collectively as the "1999 drug conviction." Second, Wallace had been convicted in 2001 for criminal sale of a controlled substance in the third degree. Third, Wallace had been convicted in 2010 for criminal sale of a controlled substance in the second degree. The District Court determined that each of these convictions qualified as a predicate offense under ACCA, and that Wallace was therefore subject to the 15-year minimum term of imprisonment required by that statute. Accordingly, the District Court imposed a sentence of 15 years of imprisonment, one year of supervised release, and a $100 mandatory special assessment. The District Court noted that "if there were a change in the law and I wasn't required to sentence you to fifteen years, I would sentence you to ten."

## DISCUSSION

Wallace's principal argument on appeal is that the District Court erred in denying his motion to suppress, because the traffic stop that led to the discovery of the firearm was unconstitutionally prolonged under the standards articulated by the Supreme Court in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015).[2] Wallace also argues that the District Court's denial of his motion to suppress was based on

---

[2] Although not decided by the District Court in its denial of the motion to suppress, this issue was raised before the District Court during the suppression hearing. Because this case presents no need for additional fact-finding, and only questions of law remain, we exercise our "broad discretion" to consider the issue for the first time on appeal. *See Baker v. Dorfman*, 239 F.3d 415, 420 (2d Cir. 2000).

erroneous factual findings, and that he was improperly sentenced under ACCA because he had not previously been convicted of three "serious drug offense[s]" within the meaning of that statute. 18 U.S.C. § 924(e)(1).

"On appeal from a denial of a suppression motion, we review a district court's findings of fact for clear error, and its resolution of questions of law and mixed questions of law and fact *de novo*." *United States v. Gomez*, 877 F.3d 76, 85 (2d Cir. 2017). We "pay special deference to the district court's factual determinations going to witness credibility." *United States v. Jiau*, 734 F.3d 147, 151 (2d Cir. 2013).

## I.    Motion to Suppress

Wallace argues that the District Court improperly denied his motion to suppress the firearm principally on the ground that it was discovered as the result of an unconstitutionally prolonged traffic stop. In a supplemental brief filed on his own behalf, Wallace (who is counseled) also argues that the District Court improperly denied his motion based on erroneous factual findings.   We reject both arguments.

### A.  Duration of the Traffic Stop

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). "Therefore, traffic stops must satisfy the Fourth Amendment's reasonableness limitation, which requires that an officer making a

11

traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *Gomez*, 877 F.3d at 86 (internal quotation marks omitted). Even if lawful at its inception, a traffic stop "can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

Consistent with these principles, the Supreme Court in *Rodriguez v. United States* held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." 135 S. Ct. at 1612. Because a traffic stop's "mission" is to "address the traffic violation that warranted the stop and attend to related safety concerns . . . [a]uthority for the seizure [] ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 1614 (internal citations omitted). These tasks include both "determining whether to issue a traffic ticket" and conducting "ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615. Unlike such "ordinary inquiries," however, unrelated investigations into criminal wrongdoing may be conducted, absent reasonable suspicion, only if they "[do] not lengthen the roadside detention." *Id.* at 1614. Thus, while an officer

12

completing a lawful traffic stop may conduct "certain unrelated checks . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615 (internal citations omitted).

As *Rodriguez* confirms, however, a traffic stop may be extended beyond the point of completing its mission "if an officer develops a reasonable suspicion of criminal activity[.]" *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015); *see also Rodriguez*, 135 S. Ct. at 1616–17 (remanding for further consideration as to whether the prolongation of the traffic stop was justified by reasonable suspicion). Reasonable suspicion "demands specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting legal wrongdoing." *United States v. Singletary*, 798 F.3d 55, 59 (2d Cir. 2015) (internal citations and quotation marks omitted). In assessing reasonable suspicion, courts look at "the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene, whose insights are necessarily guided by his experience and training." *Id.* at 60. Courts do not, however, "merely defer to police officers' judgment." *Id.*

Wallace argues that, under *Rodriguez*, the traffic stop that led to his arrest was unconstitutionally prolonged. He contends that by 7:22 p.m., when the Rugby report revealed that a vehicle with the same license plate number and a VIN matching the VIN on the dashboard of the vehicle at the scene was registered to Wallace, the officers

13

had "all of the information needed," *Gomez*, 877 F.3d at 90, to complete the mission of the stop. Moreover, Wallace argues, the results of the Rugby report necessarily dispelled any reasonable suspicion that the vehicle may have been stolen. Thus, according to Wallace, the remaining seven minutes of the stop were an unconstitutional detention, rendering the evidence derived from it inadmissible.

Wallace's argument assumes that the results of the Rugby report (1) necessarily resolved any "ordinary inquiries incident to the traffic stop," 135 S. Ct. at 1615 (brackets omitted), and (2) conclusively dispelled any reasonable suspicion that the car was stolen. While we express no view on the former proposition, we reject the latter under the circumstances of this case.[3]

Initially, we observe that—absent the results of the Rugby report—it would be quite clear that the officers' limited extension of the traffic stop in this case was supported by reasonable suspicion. The officers testified that they observed a host of unusual circumstances at the scene, which collectively caused them to suspect that the vehicle may have been stolen. First, they saw scratch marks on the upper-right portion of the driver's side door, which indicated to both officers that someone had

---

[3] The Government, relying on *New York v. Class*, 475 U.S. 106 (1986), argues that the traffic stop was not prolonged beyond the time reasonably required to complete its mission, because the officers' efforts to inspect the VIN constituted "ordinary inquiries incident to a traffic stop" and were thus part of the traffic stop's lawful "mission," *Rodriguez*, 135 S. Ct. at 1615 (brackets omitted); s*ee also United States v. Ramos*, 723 F. App'x 632, 637 (10th Cir. 2018) (relying on *Class* to hold that an officer's effort to confirm a VIN by inspecting the vehicle's doorjamb was, "like a demand to see license and registration papers, [] within the scope of police authority pursuant to a traffic violation stop."). Because we hold that the prolongation of the instant traffic stop was justified by the officers' reasonable suspicion that the car was stolen, we do not decide whether *Class* provides an independent basis to affirm the judgment of the District Court.

14

forcibly entered the vehicle. Wallace, in fact, admitted that the scratch marks had been caused by a forced entry (though he claimed that he had broken into his own car after locking himself out). Second, Wallace was unable to produce the registration for his vehicle. Third, the vehicle's registration and inspection stickers were damaged (affecting the visibility of the VIN on the registration sticker) and appeared to have been tampered with and re-taped onto the windshield. Finally, when questioned about the condition of these stickers, Wallace stated that they had been damaged by a defogging spray, an explanation the officers found not to be credible. The officers' testimony about these unusual circumstances was credited by the District Court and, in some cases, corroborated by Wallace's own testimony and by photographic evidence. These "specific and articulable facts" provided the officers with a "particularized and objective basis for suspecting legal wrongdoing," which—at least absent the results of the Rugby report—amply sufficed to establish reasonable suspicion. *Singletary*, 798 F.3d at 59; *cf. Foreste*, 780 F.3d at 526 (holding that, where the driver provided an expired rental agreement and appeared to have an uneasy demeanor, an officer had reasonable suspicion that the car was stolen); *United States v. Lewis*, 712 F. App'x 83, 84 (2d Cir. 2018) (summary order) (holding that the officers had reasonable suspicion to prolong a traffic stop where a rental car lacked the usual barcode, the officers observed six air fresheners in the car, and the driver and

15

passenger gave inconsistent information about the nature of their relationship and their trip).

The only question remaining, then, is whether the results of the Rugby report necessarily dispelled that reasonable suspicion. Under the circumstances of this case, we conclude that it did not. Assuming for the purposes of this opinion that all of the officers at the scene knew about the results of the report[4]—though, as noted above, the record on that point is far from clear—the officers here were justified in extending the traffic stop for the limited purpose of confirming the VIN in one non-public, minimally intrusive location. As explained above, Haskovic testified at the suppression hearing that a Rugby report which indicates that a visible VIN on a stopped vehicle is the same VIN that is registered to the driver does not necessarily provide conclusive proof that the vehicle is, in fact, not stolen. Instead, in the case of a VIN swap, a Rugby report could fail to identify a stolen vehicle, because it would provide information about a vehicle other than the (stolen) one that had been pulled over. It is for that reason that examination of a non-public VIN may, in such circumstances, be helpful to determining if a vehicle has been stolen. The District

---

[4] Wallace argues that if any officer at the scene knew about the results of the Rugby report, that officer's knowledge must be imputed to the remaining officers under the collective knowledge doctrine. Because we hold that reasonable suspicion was present in this case even if all of the officers knew about the results of the Rugby report, we do not here decide whether the collective knowledge doctrine applies under the circumstances of this case.

Court credited Haskovic's testimony about his training on VIN swaps, and we see no clear error in that credibility determination.[5]

Given Haskovic's testimony that, in the event of a VIN swap, a Rugby report might fail to detect that a vehicle is stolen, it is not true, as Wallace urges, that the results of the Rugby report necessarily dispelled the officers' otherwise-reasonable suspicion that the car was stolen. Here, there were numerous other factors suggesting that Wallace's vehicle not only may have been stolen, but more specifically, that it may have been subjected to a VIN swap—the very circumstance under which, according to Haskovic's training, a stolen vehicle might successfully evade detection by a Rugby report. These factors included that the vehicle had indisputably been broken into, the damaged and taped-on condition of the registration sticker, Wallace's inability to produce his registration, and his suspicious explanations for the condition of his vehicle. The officers were thus presented not only with a specific and articulable basis for suspecting that the vehicle was stolen, but also with a specific and articulable

---

[5] Contrary to the dissent's assertions, Haskovic did not "testif[y] quite differently from the other officers regarding reasonable suspicion." Dissent at 9. Like Haskovic, Monahan testified that he suspected that Wallace's vehicle may have been stolen. App'x 311 ("It led to the suspicion that yes, it possibly could have been stolen."). Monahan further testified that he and Haskovic jointly decided to check the Federal Label because they "were looking for another place, another location on the vehicle that would match the VIN number to the public VIN to make us feel more confident that that public VIN did in fact belong to the vehicle." *Id.*; *see also* App'x 277. Similarly, Alston testified that he was familiar with VIN swaps and provided a description of the technique that was consistent with Haskovic's. *See* App'x 408 ("A VIN swap is when one vehicle and another vehicle, they have the same body style, make, and one person, they steal the vehicle, and they use the other VINs from the nonstolen vehicle to pass as their own."). In the portion of Alston's testimony quoted by the dissent, Alston merely confirmed that "there was no *notation* [in any Rugby report] that [he was] aware of that this car was stolen." App'x 443 (emphasis added). Alston elsewhere clarified that he "didn't see any results" of a Rugby report, App'x 419, and he never testified—as suggested by the dissent—that the officers at the scene had no reasonable basis to suspect that the car was stolen.

17

basis for doubting the conclusiveness of the Rugby report. The officers were not required to ignore both their training and the unusual circumstances at the scene and to defer, instead, to a Rugby report, whose effectiveness at detecting auto theft they had reason to question under the circumstances.

It may be true that, under most circumstances, a Rugby report run during a traffic stop would confirm ownership of a vehicle and dispel any reasonable suspicion of auto theft. But we cannot agree with Wallace that such a report *necessarily* dispels reasonable suspicion of a stolen vehicle, regardless of the other circumstances that may be present at the scene. Reasonable suspicion is evaluated based on the totality of the circumstances. Here, there were numerous factors suggesting both that Wallace's vehicle may have been stolen and that the results of the Rugby report may have been inconclusive. These circumstances lead us to conclude that the officers reasonably formed the suspicion, despite the Rugby report, that "criminal activity may [have been] afoot." *Singleton*, 798 F.3d at 60; *see Lewis*, 712 F. App'x at 84.

The dissent does not disagree that "under certain circumstances . . . a Rugby report may not dispel suspicion" of a stolen vehicle. It argues, instead, that the confluence of suspicious circumstances presented at this traffic stop was not enough, primarily because in this case there was no visible damage to the Public VIN on the dashboard. We respectfully disagree. Although it is true that the officers here did not observe any damage to the Public VIN, they did observe considerable damage to

18

the VIN on the registration sticker, which looked like it had been peeled off and taped back onto the windshield. As explained above, this factor—along with the undisputed signs of forced entry, the missing registration, and the driver's suspicious explanations for the condition of his car—gave rise to a reasonable suspicion that the car was stolen and that the theft was accomplished using a method specifically designed to evade detection by a Rugby, or similar, report. Unlike the dissent, we do not think that noticeable damage to the Public VIN is essential to establish reasonable suspicion of auto theft if a Rugby report indicates that a vehicle has not been stolen or otherwise does not yield suspicious results.

The officers' extension of the traffic stop in this case, moreover, was limited and narrowly tailored to their reasonably-formed suspicions. The officers briefly questioned Wallace about the scratch marks on his door and the condition of his registration sticker, and then quickly sought to confirm the VIN by cross-checking it in one additional location. The location they checked (the doorjamb) was minimally intrusive, and before proceeding to inspect it, they obtained Wallace's consent. A total of nine minutes elapsed between when the officers pulled over Wallace's vehicle at 7:20 p.m. and when they arrested him at 7:29. Given all these circumstances, we conclude that the officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly," *Foreste*, 780 F.3d at 526, and that the

19

duration of the traffic stop was reasonable and consistent with the requirements of the Fourth Amendment.

### B. The District Court's Factual Findings

Wallace next argues that the District Court erred in concluding that (1) his brake light was defective, (2) he consented to the opening of his car door, (3) Wallace knew that the Federal Label was missing, and (4) Haskovic found the firearm while conducting an inventory search of the vehicle, during which he had the added purpose of searching for an additional VIN.

We review the factual findings of the District Court for clear error. *United States v. Murphy*, 703 F.3d 182, 188 (2d Cir. 2012). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id*. "When, as here, credibility determinations are at issue, we give particularly strong deference to a district court finding." *Id.* at 189.

We find no clear error in the factual findings of the District Court, which were supported by evidence in the record and appropriately informed by its credibility determinations. Most of the factual findings required the District Court to resolve the competing testimonies of Wallace, on the one hand, and the officers, on the other. The Court did so based on its assessment of the witnesses' credibility, which it described in its opinion. Having reviewed the testimonies of the witnesses and the credibility

20

determinations of the District Court, we cannot say that we are left with the "definite and firm conviction that a mistake has been committed." *Id.* at 188. Accordingly, we conclude that the District Court did not clearly err in reaching the factual findings challenged by Wallace.

**II.      Eligibility under ACCA**

Lastly, Wallace argues that the District Court erred in sentencing him pursuant to the enhanced penalty provisions of ACCA. Under ACCA, a person who violates 18 U.S.C. § 922(g) who has "three previous convictions . . . for a violent felony or serious drug offense . . . shall be fined under this title and imprisoned not less than fifteen years[.]" 18 U.S.C. § 924(e)(1). A "serious drug offense" includes, as relevant here, "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance . . . for which a maximum term of imprisonment of ten years or more is prescribed by law[.]" 18 U.S.C. § 922(e)(2)(A)(ii). Wallace argues that two of his prior drug convictions—the 1999 conviction and the 2001 conviction—do not fit within this definition. We hold that both offenses constitute "serious drug offense[s]" within the meaning of the statute.

**A. The 1999 Conviction**

Wallace first argues that his 1999 conviction for attempted criminal sale of a controlled substance in the third degree does not qualify as a "serious drug offense."

He points out that because the statute under which he was convicted, NYPL § 220.39, prohibits "knowingly and unlawfully sell[ing] a narcotic drug," and "to sell" for the purposes of the law is defined as "to sell, exchange, give or dispose of to another, o*r to offer or agree to do the same*," NYPL § 220.00(01) (emphasis added), a conviction, like his, for *attempted* criminal sale of a controlled substance requires only an attempt to "offer or agree" to sell a narcotic drug. Wallace argues that an attempt to "offer or agree" to sell a narcotic drug does not fall within ACCA's definition of a "serious drug offense," because it does not "involv[e] manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance[.]" 18 U.S.C. § 922(e)(2)(A)(ii).

Wallace's argument fails because we have previously "reject[ed] [the] contention that attempts to commit a serious drug offense [are] not themselves meant to be considered serious drug offenses." *United States v. King*, 325 F.3d 110, 113 (2d Cir. 2003). In *King*, we explained that, in light of the "expansive connotations" of the word "involving," ACCA's definition of a serious drug offense "must be construed as extending the focus of § 924(e) beyond the precise offenses of distributing, manufacturing, or possessing, and as encompassing as well offenses that are related to or connected with such conduct." *Id.* Thus, in *King*, we held that a conviction for attempted possession of cocaine in the third degree, which was punishable by a term of imprisonment of up to 15 years, "was a conviction for a serious drug offense"

within the meaning of ACCA. *Id.* at 114–15. Similarly, in *Rivera v. United States*, 716 F.3d 685, 690 (2d Cir. 2013)—while addressing a different challenge to the applicability of ACCA—we held that a conviction for attempted criminal sale of a controlled substance under the same statute that is at issue here "count[ed] as a predicate 'serious drug offense' under ACCA."

The same is true in this case. If an attempt to possess a controlled substance "involv[es] . . . possessing . . . a controlled substance," *King*, 325 F.3d at 114, so too does an attempt to sell—or to offer or agree to sell—a controlled substance "involv[e] . . . distributing . . . a controlled substance." Wallace's 1999 conviction, which at the time was punishable by up to 15 years of imprisonment, thus qualifies as a "serious drug offense" under *Rivera* and *King*.

**B. The 2001 Conviction**

Wallace next argues (on his own behalf) that his 2001 conviction for criminal sale of a controlled substance in the third degree no longer constitutes a "serious drug offense," because the maximum penalty for that crime—which was 25 years at the time of his conviction—has since been reduced to nine years. *See* 18 U.S.C. § 922(e)(2)(A)(ii) (defining a serious drug offense as one "for which a maximum term of imprisonment of ten years or more is prescribed by law"). Although the Supreme Court held in *McNeill v. United States*, 563 U.S. 816, 817–18 (2011), that the maximum sentence *at the time of conviction* is the "maximum term of imprisonment" for ACCA

23

purposes, Wallace points out that *McNeill* does not squarely foreclose his argument because *McNeill*, unlike this case, "[did] not concern a situation in which a State subsequently lowers the maximum penalty applicable to an offense and makes that reduction available to defendants previously convicted and sentenced for that offense." *Id*. at 825 n.1. Wallace argues that because New York's Drug Law Reform Act of 2009 both reduced the maximum penalty applicable to his offense and, under some circumstances, permitted the resentencing of previously-convicted defendants, the current nine-year maximum penalty should apply, making his 2001 conviction no longer a "serious drug offense" under ACCA.

Wallace's argument fails because, as the District Court held, even if Wallace were correct that the current maximum penalty applied, his 2001 offense would still qualify as a "serious drug offense," because the maximum penalty for his offense under current law is twelve years, not nine. This is because Wallace's 2001 conviction was his second felony drug conviction and, under current New York law, "second felony drug offenders" are sentenced more harshly than first-time offenders. Specifically, for a first-time felony drug offender convicted of a Class B felony, "the term [of imprisonment] shall be at least one year and shall not exceed nine years," NYPL § 70.70(2)(a)(i), whereas for a "second felony drug offender" convicted of the same, "the term [of imprisonment] shall be at least two years and shall not exceed twelve years," NYPL § 70.70(3)(b)(i). Thus, contrary to Wallace's argument, the

24

maximum penalty applicable to his 2001 conviction was, even under current law, "ten years or more," 18 U.S.C. § 924(e)(1). The 2001 conviction thus qualifies as a predicate "serious drug offense" under ACCA. *See United States v. Rodriguez*, 553 U.S. 377, 393 (2008) (holding that the maximum term of imprisonment for ACCA purposes was the maximum term set by the state law's applicable recidivist provision, rather than the maximum term that would apply without the recidivist enhancements); *see also United States v. Gordon*, 723 F. App'x 30, 32 (2d Cir. 2018) (summary order) (applying the term of imprisonment prescribed by New York's applicable recidivist enhancements to hold that the defendant's prior drug convictions were serious drug offenses under ACCA).

Accordingly, both Wallace's 1999 conviction and his 2001 conviction were "serious drug offenses" under ACCA, and the District Court properly imposed sentence pursuant to ACCA's enhanced sentencing requirements.

**CONCLUSION**

For the foregoing reasons, the judgment of conviction is affirmed.

POOLER, *Circuit Judge*, dissenting:

The lawful traffic stop in this case ended at 7:22 p.m. At that point, (1) the officers viewed the full public VIN on the dashboard of Timmy Wallace's vehicle; (2) they observed no signs of tampering with the dashboard plate; and (3) the results of a Rugby report—a comprehensive records check through every NYPD database—matched the dashboard VIN plate and confirmed that the vehicle belonged to Wallace. Wallace should have been issued a citation for his defective brake light and been on his way, delivering pizzas in the Bronx.

Instead, despite the Rugby results that confirmed the vehicle belonged to Wallace, the officers kept going. What should have been a two-minute traffic stop snowballed into Wallace's arrest for a missing doorjamb VIN sticker, an inventory search of his car, which revealed a firearm, and his ultimate sentence of 15 years' imprisonment under ACCA. Because the traffic stop that led to Wallace's arrest was unconstitutionally prolonged, I would reverse the denial of Wallace's suppression motion, vacate his conviction, and remand.[1]

This case presents a simple question: did the Rugby report dispel the officers' reasonable suspicion that the vehicle was stolen? The majority responds

---

[1] I concur in the majority opinion with respect to the district court's factual findings and Wallace's eligibility under ACCA, if the firearm were admissible.

that it did not. It relies solely upon its view of Officer Haskovic's testimony—"that, in the event of a VIN swap, a Rugby report might fail to detect that a vehicle is stolen"—to reason in a circular fashion that the Rugby report did not dispel the officers' reasonable suspicion because of the officers' reasonable suspicion. *See* Maj. Op. at 17-18. I cannot agree. The 7:22 p.m. results of the Rugby report dispelled any reasonable suspicion that Wallace's vehicle was stolen. Accordingly, I must respectfully dissent.

### A. The Results of the Rugby Report Dispelled Any Reasonable Suspicion that the Vehicle Was Stolen.

"A traffic stop may be extended for investigatory purposes if an officer develops a reasonable suspicion of criminal activity supported by specific and articulable facts." *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015); *see also Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (explaining that an officer "may not . . . prolong[] the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual"). Here, the officers did not have reasonable suspicion supported by specific and articulable facts to detain Wallace and continue investigating after 7:22 p.m.

At 7:20 p.m., Wallace was stopped for a defective brake light. He produced a valid driver's license but not his registration card. The officers observed that

2

the registration and inspection stickers were in bad shape, with only 12 of the 17 VIN digits legible on the sticker, and there were tool marks on the driver's door, which Wallace attributed to having locked himself out at some point. Haskovic observed that the keys were in the ignition. The car was in a generally poor condition, with scratches and dents all over. "Both officers Haskovic and Monahan testified that they observed the public VIN on the dashboard of the vehicle, and that the digits on the public VIN matched the legible digits of the digits printed on the registration sticker." *United States v. Wallace*, No. 15-cr-794, 2016 WL 4367961, at *3 n.8 (S.D.N.Y. Aug. 11, 2016). There was no indication the dashboard VIN plate was tampered with in any way.

At 7:22 p.m., a Rugby report was generated, and the immediate results included Wallace's license plate, registration, VIN number, make of vehicle, date of birth, and address, and whether the car was reported stolen. The VIN in the report matched the full VIN on the dashboard plate, and the results confirmed that the vehicle was registered to Wallace. Accordingly, the officers had sufficient information in their possession by 7:22 p.m. that they never should have proceeded to the next step of examining the internal doorjamb VIN.

3

Under these circumstances, it is of no moment that the public VIN was cross-checked against the Rugby report rather than the registration sticker.[2] A VIN swap requires physical movement of the VIN plate from one vehicle to another. *See United States v. Thomas*, 973 F.2d 1152, 1155 (5th Cir. 1992); *see also People v. Joiner*, 84 Cal. App. 4th 946, 954 (2000) (explaining that a VIN "switch" or swap occurs where a dashboard "VIN plate is removed from the dash of a junked vehicle and placed on a stolen vehicle"). Despite the majority's belief, this movement bears signs. *See, e.g.*, *Thomas*, 973 F.2d at 1156 n.3 (officer suspected VIN swap where dashboard VIN plate "had been burned and repainted"); *Lopez v. United States*, Nos. cv-f-07-1449, cr-f-03-5204, 2009 WL 1657334, at *2 (E.D. Cal. June 9, 2009) (officers suspected VIN swap where dashboard VIN plate "was spray painted black and was glued on the dash board rather than having factory rivets"); *Joiner*, 84 Cal. App. 4th at 954-55 (DMV licensing inspector verifies VINs on vehicles by visually inspecting dashboard VIN plates and "report[ing] any irregularities, including scratches or marks, in the VIN plates to the DMV"); *People v. Hernandez*, No. B199604, 2008 WL 4716883, at *4 (Cal. Ct. App. Oct. 28, 2008) (officers suspected VIN swap where dashboard VIN plate was framed by

---

[2] The 12 digits of the 17 that were legible on the sticker likewise matched the records check and the dashboard VIN plate.

4

"blue tape around the upper edge of the windshield" and the "VIN on the dashboard plate did not match the VIN reflected in DMV records"); *People v. Mesa*, No. B199706, 2008 WL 525808, at *1 (Cal. Ct. App. Feb. 28, 2008) (officer suspected VIN swap where dashboard VIN plate had "scratches" and the plate "had bubbling that usually occurs when there is adhesive being applied, tending to melt part of the paint"); *see also Brocato v. Perez*, No. cv 13-8993, 2017 WL 6033046, at *2 (C.D. Cal. Oct. 4., 2017) (officers suspected VIN swap where suspicious indicia were present and records check demonstrated VIN was not on file with DMV); *Renteria v. State*, 199 S.W.3d 499, 501 (Tex. Crim. App. 2006) (officers suspected VIN swap where dashboard VIN plate was removed from abandoned salvage vehicle and records check demonstrated VIN had recently been re-registered). Here, where an untampered-with dashboard VIN plate checked out against a comprehensive records check, it was virtually impossible for the vehicle nonetheless to have been stolen or VIN-swapped.

Attempting to brush aside this conundrum, the government asserts: "[T]he Officers were not acting on a reasonable suspicion that a VIN swap had occurred[.]" Appellee's Br. at 27 n.6. Rather, the government explains, "they were acting on a reasonable suspicion that the Vehicle may have been stolen. The

5

possibility of a VIN swap is relevant only because it helps explain why the 7:22 Inquiry could not have fully dispelled a reasonable suspicion of theft based on many other facts." *Id.* But the only way the officers could have suspected the vehicle "may have been stolen" at this point was if a VIN swap had occurred. The only facts marshaled in support of this theory are the missing registration, damaged sticker, and tool marks, the very facts underlying the initial reasonable suspicion that the Rugby search dispelled.

Likewise, the unvarying chorus throughout the majority opinion echoes these suspicious facts viewed "absent the results of the Rugby report," Maj. Op. at 15, "at least absent the results of the Rugby report," Maj. Op. at 16, and "despite the Rugby report," Maj. Op. at 19. The majority does not, however, grapple with the *presence* of the Rugby report. Nor does it justify its attempts to downplay the report's significance.

First, the majority reasons that the officers were presented "with a specific and articulable basis for doubting" the report because, "according to Haskovic's training, a stolen vehicle might successfully evade detection by a Rugby report." Maj. Op. at 18. Haskovic's dissatisfaction does not constitute a specific and articulable basis. A "valid dashboard VIN [is not] a legal reason to penetrate

6

further into the vehicle." *United States v. Caro*, 248 F.3d 1240, 1246 (10th Cir. 2001). Under these circumstances, where the dashboard VIN plate was viewed in full, there was no evidence that the plate was tampered with in any way, and the VIN and the vehicle's status were confirmed by a comprehensive records check (in the sense that the VIN matched the public VIN and the results of the Rugby report did not generate suspicion), there was no specific and articulable basis for doubting the Rugby report.

Indeed, Sergeant Chan was asked, "So based on looking at this [Rugby] report, which was run at 7:22 p.m., the officer would have known that this particular vehicle was registered to Mr. Wallace, correct?" App'x at 378. Chan responded, "That's correct." App'x at 378. Likewise, Sergeant Alston was asked, "Is it fair to say [as of] 7:22 p.m. . . . there was no notation that you were aware of that this car was stolen that [Wallace] was operating[?]" App'x at 442-43. Alston responded, "That's correct." App'x at 443.

Glossing over this testimony, the majority throws up its hands, resting entirely upon Haskovic's undeterred suspicions: "The District Court credited Haskovic's testimony about his training on VIN swaps, and we see no clear error in that credibility determination." Maj. Op. at 17. Thus, the majority determines

7

that what is "true" about reasonable suspicion as it relates to the possibility of a VIN swap is what Haskovic says. *See* Maj. Op. at 17 ("Given Haskovic's testimony that, in the event of a VIN swap, a Rugby report might fail to detect that a vehicle is stolen, it is not true, as Wallace urges, that the results of the Rugby report necessarily dispelled the officers' otherwise-reasonable suspicion . . . ."). But the district court credited Haskovic's testimony with respect to his VIN swap concerns in light of Wallace's argument "that the officers had an[] ulterior motive when they pulled" him over. Special App'x at 13.

Whether reasonable suspicion existed after 7:22 p.m. is a mixed question of law and fact that we review de novo. *See United States v. Gomez*, 877 F.3d 76, 92 (2d Cir. 2017). Here, the the district court explicitly declined to make findings with respect to "whether the officers had probable cause to believe that [Wallace's] vehicle was stolen." Special App'x at 20. We "cannot merely defer to police officers' judgment in assessing reasonable suspicion." *United States v Singletary*, 798 F.3d 55, 60 (2d Cir. 2015). Haskovic attended automobile crime training. Haskovic also "had only been a police officer for about three and half years at the time of the suppression hearing," Appellee's Br. at 26 (internal quotation marks and alteration omitted); had never before seen a VIN swap; and

8

testified quite differently from the other officers regarding reasonable suspicion. *Compare* App'x at 191 (Question: "Would it have alleviated your concerns if the VIN number that was received as part of the [Rugby] inquiry matched the public VIN on the vehicle?" Haskovic response: "Not necessarily, because of the [possibility of] a VIN swap"), *with* App'x at 378 (Question: "So based on looking at this [Rugby] report, which was run at 7:22 p.m., the officer would have known that this particular vehicle was registered to Mr. Wallace, correct?" Chan response: "That's correct.").

To be sure, under certain circumstances—such as where the public VIN plate is burned, repainted, spray painted, glued on, affixed with non-standard rivets, taped, scratched, bubbling, or tampered with in any way, or where a records check or Rugby report reveals that a VIN is not on file with the DMV or has recently been re-registered—the Rugby report may not dispel suspicion. But those circumstances were not present here. *See, e.g.*, App'x at 294 (Monahan testifying: "There wasn't any damage to the public VIN, if that's what you're asking"); App'x at 443 (Question: "Is it fair to say . . . at 7:22 p.m., or before even Mr. Wallace was arrested, there was no notation that you were aware of that this car was stolen that he was operating?" Alston answer: "That's correct.").

9

Next, the majority asserts that the officers were presented "with a specific and articulable basis for doubting the conclusiveness of the Rugby report." Maj. Op. at 18. But, as noted above, Chan and Alston did not testify to this effect. *See also* App'x at 166 (Haskovic's testimony that "*I wanted to cross-reference the public VIN to*" the doorjamb VIN "[b]ecause the vehicle was displaying *to me*, based on my training," continued suspicious signs (emphasis added)). Monahan testified that there was no indication of tampering with the dashboard VIN plate. Additionally, no officer testified that the results of the Rugby report were suspicious, such that examining one of the vehicle's non-public VINs would be appropriate. *Cf. Brocato*, 2017 WL 6033046, at *2; *Renteria*, 199 S.W.3d at 501.

The majority goes on to assert that the officers had reason to question the "effectiveness [of the Rugby report] at detecting auto theft." Maj. Op. at 18. But it is difficult to fathom how a comprehensive records check confirming an undamaged full dashboard VIN plate could be less "effective" than proceeding inside the vehicle to examine one of a possible 18 non-public VINs. 49 C.F.R. § 541.5. These non-public "VINs are used by law enforcement to identify a vehicle when the public VIN has been altered or removed." *Joiner*, 84 Cal. App. 4th at 954. Here, the public VIN was neither altered nor removed.

10

Additionally, a non-public doorjamb VIN may not match the other VINs on a vehicle, even without a VIN swap having occurred. For instance, a vehicle that was involved in an accident may well have a doorjamb VIN of a *different* vehicle after undergoing a similar like, kind, and quality repair. *See* 49 C.F.R. § 565.23(e); *id.* § 567.4; *see also* Vin's Labels LLC, http://www.vinslabels.com/ what-are-replacement-vin-labels-order-vin-sticker-replacement.html (last visited July 31, 2019) ("People need replacement auto [VIN] labels when they have been in an accident and need to replace or paint parts such as the door jamb or hood of the vehicle. . . . [I]t is important that auto body and collision repair shops do not over look this aspect of car repair."). Haskovic was not justified in extending the traffic stop on the basis that it was more "effective" to open Wallace's door to inspect his internal doorjamb VIN. The traffic stop was over at 7:22 p.m.

Finally, the majority gestures to "numerous other factors" indicating a VIN swap. Maj. Op. at 18. But what were these factors? The driver's door tool marks, the registration sticker and lack of card, and Wallace's explanations that he'd locked himself out and used defogging spray that damaged the sticker, *see* Maj. Op. at 18—the very factors that gave rise to suspicion that the Rugby search dispelled. There is no evidence—visual, testimonial, or otherwise—that the

11

dashboard VIN plate was at all suspicious. There is no evidence that the Rugby

results were incomplete; that the dashboard VIN did not match the database

VIN, was not on file, or was recently re-registered; that there was a glitch and the

Rugby malfunctioned; or that the officers were concerned that Wallace's

database records had somehow been hacked.[3] There is no evidence that would

invite suspicion, apart from the very concerns addressed by the joint dashboard

VIN plate visual inspection and Rugby search. Indeed, Haskovic cited these very

concerns—rather than, for example, a suspicious VIN plate—when he explained

why he wanted to continue investigating.

The officers "diligently pursued a means of investigation that was likely to

confirm or dispel their suspicions quickly": the Rugby report. *Foreste*, 780 F.3d at

526 (internal quotation marks omitted). But having their reasonable suspicions

dispelled, the officers continued to detain Wallace and his vehicle and investigate

anyway. The stop was unconstitutionally prolonged.

---

[3] Again, I note that a Rugby report can generate a VIN that matches the vehicle's public VIN but still fail to dispel suspicion under circumstances not present here; for example, a VIN may have been recently re-registered. *See supra* at 5, 9-10.

12

**B. Examining the Internal VIN Was Not an Ordinary Inquiry Incident to the Traffic Stop.**

Absent reasonable suspicion that would justify extending a traffic stop, *id.* at 523, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns," *Rodriguez*, 135 S. Ct. at 1614 (citation omitted) (internal quotation marks omitted). The "critical question" regarding the tolerable duration of a traffic stop is whether the conduct "prolongs—*i.e.*, adds time to—the stop." *Id.* at 1616 (internal quotation marks omitted).

Although the majority declines to address whether the Rugby report necessarily resolved ordinary inquiries incident to the stop, I believe we should reach the issue. There is no question that examining a vehicle's VIN in the first place is an ordinary inquiry incident to a traffic stop. *See New York v. Class*, 475 U.S. 106, 115 (1986). The question is whether, after viewing the full, intact dashboard VIN and confirming that it matches a records check, it is still an ordinary inquiry incident to a traffic stop to seek out the doorjamb VIN in the interior of the vehicle.

It is not. In *Class*, the Supreme Court held that "the police officer's action does not violate the Fourth Amendment" where, in order to view the dashboard VIN, the officer "reach[es] into the passenger compartment of a vehicle to move papers obscuring the VIN." 475 U.S. at 107. The Supreme Court emphasized: "[O]ur holding today does not authorize police officers to enter a vehicle to obtain a dashboard-mounted VIN when the VIN is visible from outside the automobile. If the VIN is in the plain view of someone outside the vehicle, there is no justification for governmental intrusion into the passenger compartment to see it." *Id*. at 119. Here, not only was the VIN plate in plain view of someone outside the vehicle, it was also confirmed against the driver's records. There was no justification for Haskovic's intrusion into the vehicle.

At the suppression hearing, the government conceded that a "valid stop without any view that there's an issue that involves a VIN" does not allow a police officer to open the door to look for the VIN because, in the government's words, "it's diminished expectation of privacy, it's not no expectation of privacy whatsoever. So there has to be some basis." App'x at 540. That "there has to be some basis" undermines the government's ordinary-inquiry argument and highlights the key problem here: there was no basis to continue searching. I

14

would hold that where the dashboard VIN plate is readable from outside the vehicle, that VIN is confirmed (i.e., matches the registration and/or records check), and there is no indication the plate has been tampered with, an officer may not prolong the traffic stop for the purpose of further examining a VIN in the internal portion of the car.

The seven minutes the officers prolonged the stop was unconstitutional. *See Rodriguez*, 135 S. Ct. at 1614 (emphasizing the "critical question" of whether the conduct "adds time to" the traffic stop). This case embodies "how the authority to stop cars for minor traffic offenses . . . has burgeoned into a full-fledged crime-control strategy involving multiple patrol officers equipped with squad cars, guns, and lights." Sarah A. Seo, *Policing the Open Road: How Cars Transformed American Freedom* 273 (2019). For Wallace, this burgeoning means that a defective brake light has cost him fifteen years of his life.

## C. A Note on Credibility

I concur in the majority's discussion of the district court's factual findings. However, I write to note my concern with the district court's finding that Wallace knew the federal label was missing from the doorjamb, as is required under N.Y. Penal Law § 170.70. The district court made this finding for two

reasons: 1) Wallace's "deep knowledge of . . . VINS . . . and the law" evidenced in his briefing, and 2) Wallace's "acknowledge[ment] that he told officer Haskovic that [he] had previously seen car doors with stickers on them but did not know what happened to his." *Wallace*, 2016 WL 4367961, at *4.

As to the first reason, Wallace testified that he started learning about federal VIN stickers when he was incarcerated. *See* App'x at 463 (The court: "Tell me how you came to have such information about VINS . . ."; Wallace: "I started studying them when – I was using my time as I was incarcerated, you know, to study [them].") The district court found "this testimony unbelievable for numerous reasons, including defendant's general lack of credibility and defendant's high level of specific knowledge about VINs." *Wallace*, 2016 WL 4367961, at *4 n.10.

Wallace is imprisoned—and will be for a total of 15 years—for what arose from missing a federal VIN sticker on his doorjamb. It is eminently reasonable that a defendant in such circumstances would use his time incarcerated to research federal VIN stickers. *Cf. Faretta v. California*, 422 U.S. 806, 834 (1975) ("The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction."). Wallace submitted ample

16

filings below and two well-researched briefs before this Court. It is disquieting that Wallace's diligence in his pro se briefing was used to penalize him and to ascribe retroactive knowledge to him.

As to the second reason the district court made its finding, for Wallace to have violated the law by knowingly possessing a vehicle missing the doorjamb VIN sticker, "[k]nowing possession means what it says: the person must know the vehicle is missing the VIN." *Cook v. Sheldon*, 41 F.3d 73, 78 (2d Cir. 1994). During oral argument at the sentencing hearing, defense counsel emphasized that a "sticker" is not the same thing as a "federal sticker" or VIN sticker. For example, vehicles have stickers on the doorjamb, as this one did, that include tire information. At the hearing, the district court twice acknowledged that under Section 170.70, it does not suffice for Wallace to know that stickers generally appear on the doorjamb of vehicles; rather, "he needs to know it's a VIN sticker that's been placed in a particular place." App'x at 519; *see also* App'x at 526.

Nevertheless, the district court concluded that Wallace's testimony that he did not know the federal VIN sticker was missing was "not credible" because Wallace "also acknowledged that he told officer Haskovic that [he] had previously seen *car doors with stickers* on them but did not know what happened

17

to his." *Wallace*, 2016 WL 4367961, at *4 (emphasis added) (citation omitted).

Wallace's testimony and his "acknowledgement" are wholly consistent, and they do not support the conclusion that he knew the federal label was missing. Although we give strong deference to credibility determinations, *United States v. Murphy*, 703 F.3d 182, 189 (2d Cir. 2012), the reasons underlying the district court's credibility determination in this instance are deeply troubling.

### CONCLUSION

In sum, where Wallace's dashboard VIN plate was readable from outside the vehicle, there was no indication the plate had been tampered with, and the VIN was confirmed against the Rugby results, the Rugby report dispelled any reasonable suspicion that the vehicle was stolen and fulfilled the recognized purposes of a traffic stop. The majority opinion allows an officer to extend a traffic stop for investigative purposes despite confirmation that the officer's suspicions are unfounded. I respectfully dissent.